# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                    No. CR 12-1695 JB

KAYLA MARIE REYES,

       Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Kayla Marie Reyes' Sentencing Memorandum and Motion for a Downward Variance, filed March 21, 2013 (Doc. 45)("Sentencing Memorandum"). The Court held a sentencing hearing on January 6, 2014. The primary issues are: (i) whether the Court will vary downward to a sentence of 15 months to reflect Defendant Kayla Marie Reyes' comparatively minimal involvement in an overall drug conspiracy; (ii) whether the Court should vary from the advisory guideline range because of a substantive disagreement, under <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007), with the United States Sentencing Commission's Guideline ranges for drug trafficking violations, as did the Honorable John Gleeson, District Judge for the United States District Court for the Eastern District of New York,[1] in <u>United States v. Diaz</u>, No. 11-CR-00821-2, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013); and (iii) whether the Court should consider the costs of incarceration and supervised release in sentencing. The Court will vary downward, but not as much as Reyes requests: it will vary to a sentence of 30 months, which the Court concludes best reflects the factors that Congress laid out in 18 U.S.C. § 3553(a). The Court concludes that Judge Gleeson's

---

[1] Judge Gleeson and the Court were contemporaries at the University of Virginia School of Law: Judge Gleeson graduated in 1980, and the Court in 1981.

criticisms of the Commission's Guideline ranges for drug trafficking lack a sound basis. Accordingly, the Court will not adopt his substantive disagreement under <u>Kimbrough v. United States</u> with the Commission's Guideline for drug trafficking offenses. The Court varies for reasons tied to the factors in § 3553(a) and to Reyes' individual circumstances, and not because of a substantive disagreement with the Commission's ranges for drug trafficking. Finally, the Court will not consider the costs of incarceration and supervised release in sentencing, because the factors in § 3553(a) do not clearly permit the Court to consider costs, and because those concerned about the fiscal implications of criminal justice policy should petition the other branches of government and should not ask the Court to consider such implications in sentencing an individual defendant.

**FACTUAL BACKGROUND**

The Court sets forth the factual background in two parts. First, it discusses Reyes, her offense, and her arrest. Second, it discusses her allegations about the drug trafficking organization with which she and her half-sister were involved and about the details of the methamphetamine trade.

1.    **Reyes, Her Offense, and Her Arrest.**

At the time of the offense, Reyes was nineteen years old; at the time of her sentencing, she was twenty years old. <u>See</u> PSR ¶ 467, at 9. She "dropped out of high school after the 7th grade when she became pregnant with her first daughter." Sentencing Memorandum at 7. Reyes now has three children. <u>See</u> Supplemental Sentencing Memorandum and Motion for a Downward Variance at 6, filed December 12, 2013 (Doc. 57)("Supplemental Sentencing Memorandum"). Reyes' "daughter suffers from severe asthma which at times requires hospitalization and frequent medical treatment." PSR ¶ 82, at 15-16. Moreover, Reyes "reports

being a vital resource in being a caregiver for her mother [--] who resides in the same apartment complex [ -- ] as her mother suffers from heart issues, diabetes and high blood pressure."  PSR ¶ 82, at 16.  Although Reyes was not married at the time of the offense, she married on October 12, 2012.  See Sentencing Memorandum at 6.  Reyes has had no contact with the criminal justice system throughout her life.  See PSR ¶¶ 40-45, at 9; Sentencing Memorandum at 9.  With respect to Reyes' history and characteristics, the United States argues that, "[a]lthough [she] has no prior documented criminal history, she admitted that she has made two prior transports of drugs."  Response at 3.

Reyes points out that her half-sister recruited her into this crime and contends that, when her half-sister drew her to criminal activity, Reyes "had little direction and no real prospects."  Sentencing Memorandum at 7.

On June 21, 2012, a Drug Enforcement Agency ("DEA") agent intercepted Reyes and her companion, Christopher Reyes, at a Greyhound Bus Station in Albuquerque, New Mexico.  See Presentence Investigation Report ¶ 11, at 4, disclosed February 6, 2013 ("PSR").  With their consent, the DEA agent searched their luggage and discovered a substance that later tested positive for methamphetamine.  See PSR ¶¶ 12-20, at 6.  The substance weighed 2.35 kilograms.  See PSR ¶ 20, at 6.

**2.     Reyes' Allegations About the Drug Trafficking Organization With Which Reyes and Her Half-Sister Were Involved, and About the Details of the Methamphetamine Trade.**

According to Reyes, Mexican drug operations "import[] large quantities of methamphetamine into the United States," and "utilize[] young women as couriers and maintains bank accounts in the United States."  Sentencing Memorandum at 4.  Reyes asserts that such an organization controlled the methamphetamine that she carried.  See Sentencing Memorandum at

4.  Reyes asserts that drug organizations of this sort now actively recruit young, "desperately poor women to serve as couriers . . . because they are less likely to be the subject of police scrutiny, and if apprehended, are easily dispensable," and that she was caught up in that recruiting strategy.  Sentencing Memorandum at 4.  Reyes states that she was "a courier at the very bottom of the enterprise," and that the organization recruited her "for a paltry profit because, given her poverty, the comparatively modest remuneration was of real value." Sentencing Memorandum at 5.

Reyes asserts that "[t]he cost of the drug to the owner is nominal and the cost of loss of any individual load transported by a courier is minimal," and argues that, "[a]s a result, very low level couriers can be entrusted with great quantities of methamphetamine without the quantity bearing any relationship to their importance to the organization."  Sentencing Memorandum at 5. Reyes contends that "[t]he risk to the organization is not the loss of the street value of methamphetamine, which may be fairly high.  Rather, the risk for the organization is the cost of the product, which is very low."  Sentencing Memorandum at 5.

## PROCEDURAL BACKGROUND

On July 10, 2012, Plaintiff United States of America charged Reyes with Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine and Aiding and Abetting in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2.  See Indictment, filed July 10, 2012 (Doc. 17).  Reyes pleaded guilty to the Indictment.  See Plea Agreement, filed November 14, 2012 (Doc. 36).

In the Plea Agreement, the United States and Reyes stipulated that Reyes was a minor participant in the criminal activity underlying the agreement, and that, therefore, she "is entitled to a reduction of two levels from the base offense level as calculated under the sentencing

guidelines." Plea Agreement ¶10.1, at 5. The Plea Agreement also acknowledged that Reyes might be eligible for the "safety valve" provision in 18 U.S.C. § 3553(f)(1)-(5) and U.S.S.G. § 5C1.2, but did not resolve that issue. See Plea Agreement ¶ 5, at 3.

The PSR acknowledged that the base offense level would have been 31, see PSR ¶ 29, at 7-8, but concluded that, based on the representation of the Assistant United States Attorney that Reyes "had provided the Government with truthful information concerning the offense," the USPO "determined that the defendant does meet the criteria of U.S.S.G. § 5C1.2" -- that is, the "safety valve" provision -- and that a two-level decrease applies, PSR ¶ 30, at 8. The USPO then applied the second 2-level decrease pursuant to U.S.S.G. § 3B1.2 for minor role, to which the parties had stipulated; the USPO calculated her offense level as 27. See PSR ¶¶ 32-34, at 8. After applying the two-level reduction for acceptance of responsibility under § 3E.1(a) and the additional one-level reduction under § 3E1.1(b), the PSR calculated her offense level as 24. See PSR ¶¶ 36-38, at 8. The USPO further calculated Reyes' criminal history category as I, see PSR ¶ 42, at 9, producing a Guideline range of 51-63 months. The USPO initially suggested a sentence of 30 months. See PSR ¶ 83, at 16.[2] In the Second Addendum to the Presentence Report, disclosed December 13, 2013, the USPO revised its recommended variance downward to 24 months, taking into account Reyes' performance on pretrial release and the birth of her daughter. See Second Addendum to the Presentence Report at 1-2. No party disputed the USPO's calculations; the parties' arguments at sentencing centered around a proposed variance.

Reyes points out that she "was released on her own recognizance on June 25, 2012," and that she "has lived since then in Phoenix, Arizona, and complied with the standard conditions of release. She has been fully compliant, without any incidents." Sentencing Memorandum at 7.

---

[2] The First Addendum to the Presentence Report, disclosed February 12, 2013, related only to factual matters and not to sentencing calculations.

Reyes submits that, during pre-trial release, she "has assiduously applied herself to her education," attending general educational development ("GED") classes; although she is not yet prepared to take the GED test, her "instructor describes [her] as a hard worker who is making 'great progress.'  The pre-sentence report notes this as a basis for a variance."  Sentencing Memorandum at 7 (internal citations omitted).  Reyes submits that this "experience has transformed" her: "As she noted to the pre-sentence reporter, 'I really liked going to school.  I am learning so much stuff that I had never learned.'"  Sentencing Memorandum at 7.  Reyes asserts that she "has responded well to structure imposed by pre-trial services and has developed a routine by which she has begun to develop a stake in society."  Sentencing Memorandum at 8.  Reyes submits that, despite her good start in GED courses, "[s]he was forced to discontinue her GED efforts this year when her pregnancy became problematic."  Supplemental Sentencing Memorandum at 6.  Reyes has, after the birth of her daughter, worked for a temporary employment agency, and, "[o]n December 2, 2013, she began a new position working at Signature Breads and earning $7.80 per hour."  Sentencing Memorandum at 6 (citing Letter from Premier Employee Solutions to To whom it may concern, executed November 22, 2013, filed December 12, 2013 (Doc. 58)).

In her Sentencing Memorandum, Reyes reminds the Court that it must consider the factors in § 3553(a) that Congress laid out for courts to consider in deciding an appropriate sentence.  See Sentencing Memorandum at 1-2.  Reyes concedes that her Guideline range is appropriately calculated at 51-63 months, but points out that her plea agreement allows her to seek a downward variance; she asks the Court to vary downward to a sentence of 15 months.  See Sentencing Memorandum at 2.  Reyes contends that the nature and circumstances of the offense -- one of the factors listed in § 3553 -- "are particularly important in assessing the

requested variance."  Sentencing Memorandum at 3.

Reyes concedes that statistics to support that assertion "are difficult to collect" and that her "[c]ounsel has not been able to find studies that separate drug arrests by gender and by charge, such as simple possession versus distribution quantities."  Sentencing Memorandum at 4-5.  Reyes submits that "[i]ncarceration rates for women from 1985 to 2006, however, rose 300%.  Drug offenses constitute the bulk of these increase[s]."  Sentencing Memorandum at 5 (citing Randall G. Shelden, Sentencing Patterns, the War on Drugs and Women at tbl. 1, http://www.sheldensays.com/res-nineteen.htm).  Reyes' counsel also states that, "[a]necdotally, lawyers for the Federal Defenders Office in Albuquerque have seen a significant increase in the use of women as couriers."  Sentencing Memorandum at 5.

Reyes states that the PSR notes her performance in pursuing her GED "as a basis for a variance," Sentencing Memorandum at 7 (internal citations omitted).  Reyes also submits that, although "she had little direction and no real prospects" when her half-sister drew her into criminal activity, "[s]he comes to sentencing in a much different posture."  Sentencing Memorandum at 7.  Reyes contends those who commit courier crimes have little economic attachment to society, "are generally underemployed, have minimal skills and [have] no sense that there is a place or future for them in the legal economy."  Sentencing Memorandum at 8.  "To change that mentality, which is particularly susceptible to the temptations of crime," Reyes contends that "a person must feel that there is a possibility for a decent life from lawful pursuits.  As long as there is no expectation that one can improve one['s] circumstances, people will be at risk of turning to desperate, illegal options."  Sentencing Memorandum at 8.  According to Reyes, she is only now appreciating that she can change her poverty and marginalization, and that she, therefore, "now presents a better prospect for rehabilitation and future productivity than

- 7 -

she might have at the time of her arrest." Sentencing Memorandum at 8.

Turning to the Guidelines, Reyes suggests that they "are founded upon the theory that there is a direct relationship between the quantity of drugs possessed and the significance of the possessor within the enterprise." Sentencing Memorandum at 5. Reyes argues that this rationale does not apply in the methamphetamine context, because it "is now manufactured by large efficient factories in Mexico which operate with little fear of apprehension," and with very low manufacturing costs. Sentencing Memorandum at 5. Accordingly, Reyes submits that "[t]he premise underlying U.S.S.G. § 2D1.1 is misplaced. The quantity of drugs bears no significant relationship to the importance of the defendant. Therefore, Ms. Reyes' drug quantity base offense level of [2]4, grossly overstates her real importance in the economy of methamphetamine trafficking." Sentencing Memorandum at 6.

Reyes concedes that other reductions -- those "pursuant to U.S.S.G. [§§] 2D1.1(a)(5)(B) and 3B1.2 (mitigating role)" -- have "reduced her base offense level by 5 levels." Sentencing Memorandum at 6. Reyes insists, however, that even the adjusted level of 29 "over represents Ms. Reyes' role in an organization which the case agent described as 'only a courier'." Sentencing Memorandum at 6 (quote unattributed). Reyes points out that "[t]he sentence reporter noted that 'the defendant was identified as a courier and appeared to be working under the direction of another.' It is noted the defendant has no criminal history.' [sic] The pre-sentence report also notes her subservient role in the offense as a ground for variance." Sentencing Memorandum at 6 (citing PSR ¶ 82, at 15).

Turning to the sentencing factors, Reyes submits that, while a Guideline sentence might be appropriate "for an involved drug dealer who had a proprietary interest in the shipment," that rational does not extend to her: she "was called [sic] from the most susceptible, vulnerable, and

targeted population to serve as a drug courier," and, accordingly, "[a] guideline sentence would not adequately take into account her role as the most unsophisticated and unconnected courier for those reaping the greatest profits from her efforts." Sentencing Memorandum at 6. Moreover, she points out that "she has realized the seriousness of her offense and has disassociated herself from the criminal element." Sentencing Memorandum at 6-7. Reyes argues that a less-than-Guideline sentence would adequately deter her and reflect the seriousness of her offense, and that, "[g]iven her exceedingly low level in the drug organization and her renunciation of even that activity," a lower sentence "will adequately protect the public from any further crimes of the defendant." Sentencing Memorandum at 7.

With this backdrop, Reyes suggests that she has taken it upon herself to pursue education and training, "firmly grasp[ing] the rehabilitations offered her which, ironically, may not have been so apparent before her arrest." Sentencing Memorandum at 8. Reyes contends that a long sentence would compromise her "position as an expectant mother and current care giver for two young children." Sentencing Memorandum at 8. She argues that the fact "[t]hat she has responded well to a structure similar to that which she will face upon supervised release all bodes well for the future and diminishes the need for a guideline sentence to protect the public from future crimes." Sentencing Memorandum at 8.

Reyes also points out that she not only lacks criminal history points, but she also "has had no contact with the criminal justice system in any respect throughout her life," and argues that "[]her complete lack of sophistication or experience with the criminal justice system indicates that not only is her instant crime a relatively aberrant act, but that her prospects for rehabilitation are exceptionally good." Sentencing Memorandum at 9. Reyes submits that she "is a naive, essentially harmless person," and that she has never "been subject or even aware of the

extraordinary severity of federal drug crime sentences."   Sentencing Memorandum at 9.
Accordingly, Reyes submits that her "knowledge of the criminal sanction is so scant that the
general deterrent value of those sanctions was not of significant value."   Sentencing
Memorandum at 9.  She continues:

> Ms. Reyes' first foray into the criminal justice system was an exceedingly severe
> one.  The prospect of mandatory minimums and severe guideline sentences are
> now not lost upon her.  She is now pregnant and will have the child while
> incarcerated.  Her other two children have numerous medical difficulties.  As the
> primary care giver for her children to whom she is deeply committed, the severity
> of the consequences of her actions are not lost upon her.  She has learned an
> invaluable lesson.  Enforcing an extreme sanction is not necessary to drive it
> home to this otherwise, insignificant citizen.

Sentencing Memorandum at 9 (citation omitted).

   In light of those facts, Reyes suggests that the Court must "consider the need for the
sentence to reflect the seriousness of the offense and provide just punishment," as well as "the
need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."
Sentencing Memorandum at 9.  Reyes states that her "absolute lack of any involvement with the
criminal authorities means that the deterrent value of an imposed criminal sanction has not been
tested upon her and found to fail," in contrast with one who has had much contact with the
criminal justice system, who "can be seen to have been forewarned in a most direct and
hopefully meaningful fashion."  Sentencing Memorandum at 10.  Reyes argues that imposing a
severe sentence would be unnecessary, given that she has not been arrested or "had direct contact
with the criminal sanction."  Sentencing Memorandum at 10.  In sum, Reyes contends that, given
her

> responsibilities and bonds as a mother, the prospect of giving birth in custody and
> the obvious harm which her absence will cause her children, a prison sentence for
> Ms. Reyes exact a greater level of misery than that for someone without such
> maternal bonds to the free world.  That she may suffer more greatly than one not
> similarly situated, means that a less than guideline sentence will exact an adequate

measure of punishment.

Sentencing Memorandum at 10.

In the Government's Response to Defendant Kayla Marie Reyes' Sentencing Memorandum and Motion for a Downward Variance (Doc. 45), filed March 28, 2013 (Doc. 47)("Response"), the United States concedes that a variance may be justified, but opposes the variance down to 15 months that Reyes suggests.  Response at 1.  The United States first reminds the Court that Reyes pled guilty to "Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine.  If the Defendant had been convicted at trial, she faced a guideline imprisonment range of 120 months."  Response at 1.  The United States asserts that, when a DEA agent encountered Reyes at a bus station, Reyes consented to a search of her luggage, in which the DEA found "2.35 gross kilograms of Methamphetamine." Response at 2.

With respect to the nature and circumstances of Reyes' offense, the United States suggests that Congress expressed its views of the seriousness of the crime of possession with intent to distribute a controlled substance "by imposing a penalty of ten years to life in prison for those convicted of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)."  Response at 2.  With respect to Reyes' history and characteristics, the United States argues that, "[a]lthough [she] has no prior documented criminal history, she admitted that she has made two prior transports of drugs." Response at 3.  The United States notes that Reyes is working to obtain her GED.  See Response at  3.  In response to the need for the Court to impose a sentence that promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from any future crimes by Reyes, the United States contends that a sentence within the Guideline range of 51-63 months "is a reasonable sentence based upon the Defendant's eligibility for the 'safety

valve' provision and role adjustment as a minor participant."  Response at 3.  The United States asserts that, to avoid unwarranted sentencing disparity, a Guideline sentence is the best approach, and that the Guideline sentence of between 41 and 51 months is appropriate.  See Response at 3.[3] With respect to the need to provide Reyes needed training or treatment, the United States asserts that Reyes' "failure to contemplate consequences before acting has seriously impacted her own life as well as the safety of the community."  Response at 3.  Accordingly, the United States asks the Court to "conclude that a sentence within the guideline imprisonment range of 41 to 51 months would constitute a reasonable sentence."  Response at 3.  If, however, the Court decides that it is appropriate to vary from the Guideline range, "the United States would recommend that to avoid unwarranted sentencing disparities between defendants who have committed similar crimes or as in this case, defendants who receive reductions in their guideline range due to 'safety valve' and role adjustment, that any variance no [sic] go below thirty months."  Response at 3.

In her Supplemental Sentencing Memorandum, Reyes asserts that sentencing has been delayed on her motions for continuance based on "her pregnancy, the birth of her daughter and the need to breast feed her newborn.  During this period several additional factors arose which are pertinent to the requested variance."  Supplemental Sentencing Memorandum at 1.  The first fact relates to the nature and circumstances of the offense: Reyes points out that her half-sister recruited her.  See Supplemental Sentencing Memorandum at 1.  She further asserts that, together with her "extraordinary progress on pre-trial release," her break from her criminal colleagues "certainly augers well for her future law abiding behavior."   Supplemental Sentencing

---

[3] During the hearing, the United States indicated that the Response's references to 41-51 months were typographical errors and that the Guideline range is, as all agreed, 51-63 months. See Tr. at 14:22-24 (Brawley).

Memorandum at 2.  Further, Reyes argues that, given "her lack of prior record" and her "amenability to supervision and renunciation of her criminal activity," she is "unlikely to repeat her criminal conduct, and the Court need not, therefore, be concerned with protecting the public from future crimes."  Supplemental Sentencing Memorandum at 2-3.

Reyes next returns to an important theme from her Sentencing Memorandum: "[G]iven the global nature of the manufacture of methamphetamine, the quantity of methamphetamine she possessed over represents the significance of her role in the drug trade."  Supplemental Sentencing Memorandum at 3.  In additional support for her thesis, Reyes points to United States v. Diaz, in which Judge Gleeson, criticized "the treatment of drug couriers under the sentencing guidelines."  Supplemental Sentencing Memorandum at 3.  In Reyes' telling,

> Judge Gleeson faults the sentencing guidelines because they are conceptually tied to the mandatory minimum sentences Congress enacted in Title 21.  By these severe sentences Congress intended to punish those with significant roles in the crimes of drug trafficking operations.  Guideline sentences, however, are not triggered by the role of the defendant but solely by the drug type and quantity. Instead of hinging a ten year mandatory minimum on the government's proof that the defendant was in a leadership status, the guidelines simply use larger drug quantities as the basis for longer sentences.  [United States v. Diaz, 2013 WL 322243, at *2] ("The genesis of the structural flaw. . . is rooted directly in the fateful choice by the original Commission to link the Guidelines ranges for all drug trafficking defendants to the onerous mandatory minimum penalties in [Title 21].")[.]   For instance, a 10 year mandatory minimum is triggered under 21 U.S.C. §[]841(b)(1)(A) at 50 grams of actual methamphetamine. The same quantity of methamphetamine under the guidelines establishes a base offense level of 32 and a sentencing range of 121 to 151 months.  U.S.S.G. §[]2D1.1 (Drug Quantity Table).  Judge Gleeson notes that the mandatory minimums are not based on empirical data, commission expertise or actual[] culpability of the defendant.

Supplemental Sentencing Memorandum at 3-4.  Reyes suggests that the Department of Justice ("DOJ") shares Judge Gleeson's assessment:

> Were Ms. Reyes prosecuted today for the same offense she would have the benefit of the [Memorandum from Eric H. Holder, Jr., Att'y Gen. of the United States, to U.S. Att'ys and Assistant U.S. Att'ys for the Criminal Div. re:

Department Policy on Charging Mandatory Minimum Sentences and Recidivist
enhancements in Certain Drug Cases (Aug. 12, 2013) at 1, available at http://big.
assets.huffingtonpost.com/HolderMandatoryMinimumsMemo.pdf        ("Holder
Memorandum")].   This memorandum sets a policy to avoid charging first time
drug offenders who meet criteria of a minimal criminal history, lack of violence
and lack of organizational role. Of course, as Judge Gleeson notes, while this
policy may have saved Ms. Reyes from the "mandatory minimum frying pan" it
still leaves her in the "Guidelines' fire". Id. at 1.   Nevertheless, it makes little
sense to apply Guidelines constructed for those with a proprietary interest or
organizational role in the drug trade to the likes of Ms. Reyes.

Supplemental Sentencing Memorandum at 4.   Reyes submits that whether a courier carries a

large quantity "bear[s] no relationship to a courier's role in the organization."   Supplemental

Sentencing Memorandum at 4.   Reyes continues:

This is particularly true with methamphetamine which is now being manufactured
in Mexico at almost no cost to the manufacturer. The proprietary investment is so
minimal and the potential profits so high that drug networks are willing to entrust
low level individuals who have no link to the organization with enormous
quantities of drugs.   Although these drugs may have a high retail/street value, the
cost to the manufacturer is negligible. Therefore, the risk of loss in entrusting
large quantities to minor players is small. As a result the quantity with which a
courier is caught bears no relationship to his or her position in the network.
Draconian guideline sentencing levels which treat such individuals as leadership
figures based solely on quanti[t]y bear little relationship to reality. They work an
inherent unfairness, fill our prisons and spend our criminal justice resources
without attacking any of the root sources of drug distribution. A guideline
sentence for a mere courier does little to further general deterrence. Similarly, it
vastly overstates the severity of the offense. 18 U.S.C. §[]3553(a)(2)(A).

Supplemental Sentencing Memorandum at 4-5.

Reyes further elaborates on her post-arrest rehabilitation argument in her Sentencing

Memorandum, stating that she "is the epitome of the poor, unsophisticated women who become

caught up as low level couriers in the drug trade."   Supplemental Sentencing Memorandum at 5.

She reiterates her arguments from her Sentencing Memorandum, and adds that she had very

young children and that she lived "in a one bedroom, one bath apartment."   Supplemental

Sentencing Memorandum at 5.   She notes that "[t]he supervising pretrial officer reported that

[she] 'is not living above her means" and states that "[t]hese means are extraordinarily meager."

Supplemental Sentencing Memorandum at 5.   She notes that, even though her poverty,

childrearing responsibilities, "and limited options for present or future security" exerted

substantial pressure on her, she "has never, not once, been involved with the criminal law."

Supplemental Sentencing Memorandum at 5.

> Reyes comments that a

> sad iron[y] that plagues the poor who become federal criminal defendants is that
> pre-trial conditions of release can provide them with  opportunity, structure and
> discipline which, if provided before their arrest, might well have kept them from
> criminal conduct altogether.   After achieving, often for the first time, some
> positive momentum in their lives, they face sentencing and the loss of all they
> have accomplished on pre-trial supervision.   This is certainly the conundrum that
> Ms. Reyes presents to the court.

Supplemental Sentencing Memorandum at 5.   She also argues that, "[m]odest as [her new

income] this may seem," she argues that, "for a 20 year old with no skills or employment history

it is a breakthrough development."   Supplemental Sentencing Memorandum at 6.   Reyes further

points out that she married on October 12, 2012, and that "she and her husband are raising their

new baby girl, Faith Reyes-Romero, and her two other children."   Supplemental Sentencing

Memorandum at 6.   She states that her husband works for the same temporary employment

agency that she does.   See Supplemental Sentencing Memorandum at 6.   She continues:

> She has a measure of stability, investment in a working life and a new found
> realization that she has a realistic stake in building a social and economic base for
> her family.  For the first time in her life Ms. Reyes overcame the hopelessness felt
> by those for whom the American economy seemingly has no place or who lack
> the stability or basic social skills to navigate it.  Given Ms. Reyes' marginal and
> transitory connection to the drug distribution world, it would seem wasteful of
> penological resources, to incarcerate her.  The Court is to consider the protection
> of the public from future crimes of the Defendant. 18 U.S.C. § 3553(a)(2)(C).
> Given her seventeen months of successful pre-trial supervision [and] the upward
> trajectory of her circumstances Ms. Reyes does not represent a significant threat
> to the public.

Supplemental Sentencing Memorandum at 7.

Reyes also argues that incarcerating her would be expensive -- costing "approximately $28,893 annually" -- and that supervised release would be cheaper.  Supplemental Sentencing Memorandum at 7.  She contends that incarceration, although sometimes necessary, "is also an expensive response that should be employed sparingly in a time of federal austerity." Supplemental Sentencing Memorandum at 7.  She submits that, "[u]nless a lengthy term of incarceration is clearly mandated by the nature of the crime or the offender, this may be a time to opt for more cost effective options."  Supplemental Sentencing Memorandum at 7.  She argues that "poverty, her children's needs and her perceived dearth of economic options" drove her crime, and that, without those circumstances, she probably would not "find her way to the criminal courts," particularly given her "complete lack of criminal history."  Supplemental Sentencing Memorandum at 7.  Reyes maintains that, "[a]s someone who has proven her amenability to supervision and treatment consistently over the past seventeen months, the cost of incarceration seems a needless excess."  Supplemental Sentencing Memorandum at 7.  In her view, "[a] fifteen month sentence with a term of lengthy supervised release will allow [her] to continue on the productive path upon which she has already embarked during the pendency of this case."  Supplemental Sentencing Memorandum at 7.  Moreover, she asserts that doing so would "save criminal justice resources for those who have committed violent crimes, have a history of not learning from their mistakes or who otherwise need or deserve lengthy terms of incarceration," and cites cases in which other courts have concluded that the circumstances in the cases before them did not justify the cost of incarcerating the defendant.  Supplemental Sentencing Memorandum at 7-8 (citing United States v. Angelos, 345 F. Supp. 2d 1227 (D. Utah 2004); United States v. Hughes, 825 F. Supp. 866 (D. Minn. 1993)).

Reyes contends that nothing in her background before this crime merits a Guideline sentence, and that

> her obvious status as a novice, naive courier and the aberrant nature of her offense argues for less than a guideline sentence. A sentence of fifteen months perhaps with a period of home confinement as a condition of supervised release will satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553.

Supplemental Sentencing Memorandum at 8.

Reyes also asks the Court to "recommend to the Bureau of Prisons that she be designated to FCI Phoenix (Female Satellite Camp) to be near her family and children, all of whom reside in Phoenix. She requests voluntary surrender." Supplemental Sentencing Memorandum at 9.

The Court held a sentencing hearing on January 6, 2014. See Transcript of Hearing, taken January 6, 2014 ("Tr.").[4] The United States moved for the third-level downward adjustment for acceptance of responsibility, with no objection from Reyes. See Tr. at 2:7-16 (Court, Brawley, Winterbottom). The Court confirmed that, following that adjustment, the offense level was 24 and the criminal history category was I, which provided a Guideline imprisonment range of 51-63 months, and Reyes agreed. See Tr. at 2:17-2:21 (Court, Winterbottom).

Upon the Court's invitation, Reyes argued for a downward variance. See Tr. at 2:23-3:4 (Court, Winterbottom). Reyes asserted that she is twenty years old, has three children, and has "absolutely no criminal history or previous contact, for that matter, with the law enforcement system, nothing whatsoever." Tr. at 3:7-10 (Winterbottom). Reyes asserted that she is "the most marginally placed person in drug commerce," that she is "naïve" and "unsophisticated," and that "she's basically a somewhat harmless mule in a much larger universe, the extent, severity and

---

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

cruelty of which she had no idea when she first started to transport this methamphetamine that brings her before the Court." Tr. at 3:10-16 (Winterbottom). Reyes asserted that "nobody on this side of the bench is strenuously opposing a variance," noting that the USPO "has recommended a variance of 24 months" and that, even though the United States believes that the floor of the variance should be thirty months, it nonetheless agreed that the facts may justify something of a variance. Tr. at 3:17-24 (Winterbottom). Reyes suggested that her progress since she filed her Sentencing Memorandum might have justified an argument for more than the fifteen-month variance that she requested. See Tr. at 3:25-4:9 (Winterbottom). Reyes reiterated her argument about the cost of incarcerating and supervising her, and asserted that "[s]upervision has proven miraculously successful since June 25 of 2012." Tr. at 4:10-15 (Winterbottom). The Court acknowledged United States v. Diaz, but asked which factor in 3553(a) allows the Court to consider cost of incarceration; Reyes suggested that the Court might consider cost under "the kinds of sentences available" prong in § 3553(a)(3). Tr. at 4:16-5:7 (Court, Winterbottom). The Court asked whether, if it determines that incarceration is appropriate for a particular defendant, it should take cost of incarceration into account, or whether that is the legislative branch's province; Reyes suggested that the Court's question was fair, but contended that, when the Court incarcerates a defendant, the Court inevitably imposes costs on the nation that are similar to a tax, and that, following the Supreme Court of the United States' decisions that rendered the Guidelines advisory, the Court should read the 3553(a) factors to encourage it to look at public policy concerns, including financial concerns. See Tr. at 5:8-6:23 (Court, Winterbottom). Reyes submits that, unlike other sentencing considerations such as what the defendant would do when she is released and deterrence arguments, "[f]inancial [considerations] are immediate." Tr. at 6:22-6:2 (Winterbottom). Accordingly, Reyes suggests that, even though Congress did not

expressly list financial considerations among the sentencing factors in 3553(a),

> the spirit of 3553 says public policy is important and it is something you can't ignore, and once the Supreme Court said you're supposed to consider the 3553 factors, I think it allows the Court, if the Court is so inclined[,] to consider public policy concerns, particularly[,] as I noted in my memorandum, when those kind of financial policy concerns are more and more being voiced as subjects worthy of consideration when we look to public policy and to criminal justice issues.

Tr. at 7:4-14 (Winterbottom).

Reyes then pivoted to discuss other bases for a variance, beginning with specific deterrence: she points out that she committed this crime when she was nineteen years old and lacked any criminal history.  See Tr. at 7:22-8:11 (Winterbottom).  Moreover, she argued, she did well in her GED training until she became pregnant, got married, and started working; she nonetheless asserted that her new full-time employment "is an enormous, enormous new factor in her life that wasn't present when she committed this crime."  Tr. at 8:12-19 (Winterbottom).  She clarified that, although she had started work with Signature Breads, she has since "started a job in a recycling plant, and is now working full-time" in addition to caring for her children, a responsibility she shares with her husband.  Tr. at 8:19-23 (Winterbottom).

Reyes' counsel also asserted that, after three decades of working in criminal justice, he has "become more and more convinced that the key [is] establishing in the defendant's mind a stake in the economy, in the fabric of law abiding life," and stated that such defendants needed the structure that Pre-trial Services provided Reyes; in his view, Reyes now had such a structure to emerge from the life of poverty and idleness that led her to this crime.  Tr. at 9:22-10:19 (Winterbottom).  He asserted that Reyes had blossomed through pre-trial services, and that her life "is on an upward trajectory for the first time" and that the Court should consider that factor in fashioning her sentence.  Tr. at 11:21-25 (Winterbottom).

With respect to general deterrence, Reyes stated that, if the forty-year war on drugs

"hasn't exacted a general deterrence, then the incremental general deterrent effect of [her] sentencing is going to be exceedingly" de minimis.  Tr. at 11:1-9 (Winterbottom).  She also points out that she is a mother of three children, and that "all the literature shows that when parents leave children and leave them to the care of others" while imprisoned, "the prospects for the child's success diminish.  Tr. at 11:9-14 (Winterbottom).  She asserts that the Court should consider the impact on her family, that she is "a loving, supportive and appropriate mother for the most part," with the exception of this case, and that the Court should consider reducing her sentence on the basis of her generally good parenting.  Tr. at 11:14-12:1 (Winterbottom).

Reyes asked the Court to sentence her to a period of 15 months: in her view, that length is a significant period of incarceration under the circumstances, and it will give her time to finish her GED.  See Tr. at 12:2-6 (Winterbottom).  She submits that she has made considerable progress towards that goal and that, although "[s]he is not a gifted scholar by any stretch of the imagination . . . she was an enthusiastic one, and[,] . . . with the discipline and the structure of the Bureau of Prisons for a not exceedingly long[]term she will be able to accomplish that task."  Tr. at 12:6-13 (Winterbottom).  Reyes also reiterated her request for voluntary surrender and to be assigned to the women's prison in Phoenix: according to her, if the Court grants voluntary surrender, she will be more likely to be eligible for that prison, "which is the only women's facility in Arizona."  Tr. at 12:14-25 (Winterbottom).  She noted that, given her family's poverty, it would be difficult for her family to visit her if she is not incarcerated in Phoenix.  See Tr. at 13:3-11 (Winterbottom).

The Court then asked Reyes if she wished to speak.  See Tr. at 13:20-24 (Court).  Reyes apologized and stated that living with her mistakes has made her a better person than she was when she committed the offense.  See Tr. at 13:25-2 (Reyes).  She stated that time away from her

children was difficult.  See Tr. at 14:2-3 (Reyes).  She continued: "Me just leaving them now is very hard, knowing they are just outside.  My daughter knows what's happening, it's just, I don't know, I did make a mistake and I apologize for it.  That's all I can say."  Tr. at 14:3-7 (Reyes). The Court asked if Reyes had any assets; Reyes said she did not.  See Tr. at 14:8-19 (Court, Reyes).

The United States reiterated its Response's request that the Court impose a sentence at the low end of the Guidelines and that, if the Court varies, it impose a sentence no lower than thirty months.  See Tr. at 15:20-16:4 (Brawley).  The United States contended that Reyes' offense is significant: "The defendant possessed 2.35 kilograms of a mixture and substance of methamphetamine.  It only takes half of a kilogram to trigger a 10 to life sentence."  Tr. at 15:5-8 (Brawley).  The United States conceded that Reyes has no criminal history, but noted that Reyes benefits from the safety-valve reduction and from the minor-role reduction, which "dropped her range which otherwise would have been at least 120 months down to 51 to 63 months."  Tr. at 15:15:9-16 (Brawley).  The United States acknowledged that Reyes' family would face hardships, but stated that "virtually every . . . defendant that crosses through th[is] courtroom has children[,] has a family that is impacted."  Tr. at 15:17-22 (Brawley).  The United States also pointed out that Reyes committed this offense aware that she had two young children and that she knew when she entered a guilty plea that, if she had a third child, the third child would also suffer her actions' consequences.  See Tr. at 15:17-16:1 (Brawley).  The United States submitted that, if the Court varies down as much as Reyes requested, it would create an unwarranted sentencing disparity, particularly given that couriers, many of whom are in similarly desperate financial situations, are arrested frequently.  See Tr. at 16:1-11 (Brawley).  The United States commended Reyes for doing well on pre-trial supervision and for acquiring new skills, but stated

that

> the fact that she's done well shouldn't warrant such a drastic variance.  The fact
> she has done so well is what has allowed her to spend all of this time at home with
> her children rather than already in custody.  And so the Government's primary
> concern [is that] there would be an unwarranted sentencing disparity if she really
> received a sentence of 15 months . . . .

Tr. at 16:11-24 (Brawley).

The Court then stated the sentence.  See Tr. at 17:3-6 (Court).  The Court accepted the

plea agreement, the PSR's factual findings, and the PSR's Guideline calculations.  See Tr. at

17:6-14 (Court).  The Court stated that Reyes meets the criteria of 18 U.S.C. § 3553(f)(1)-(5),

and that the Court would, therefore, impose the sentence pursuant to U.S.S.G. § 5C1.2 without

regard to the statutory mandatory minimum.  See Tr. at 17:17-22 (Court).  The Court confirmed

that the offense level was 24 and that the criminal history category was I, yielding a Guideline

imprisonment range of 51-63 months.  See Tr. at 17:22-24 (Court).  The Court noted that it had

considered the Guidelines, but had considered other factors as well, and concluded that the

punishment that the Guidelines set forth is not appropriate for Reyes.  See Tr. at 17:24-18:10

(Court).  The Court noted certain factors that put downward pressure on the Guidelines range:

(i) Reyes' age; (ii) her lack of criminal history; (iii) she is a mother of three children, on whom

her sentence would have an impact; (iv) she not only had no criminal history, but had no contact

with law enforcement, juvenile or otherwise, which shows that her offense was an aberration; (v)

she had a minor role, both in the offense and also in the drug world generally[5]; (vi) she is naïve

and unsophisticated; (vii) she seems harmless, which reduces the need for specific deterrence[6];

_____

[5] The Court acknowledged that Reyes had benefitted from her minor role via the minor
role adjustment, but stated that her role nonetheless continued to put some downward pressure on
the sentence.  See Tr. at 19:7-13 (Court).

[6] The Court tied the first seven factors to the notion in § 3553(a) that the Court could use

(viii) that she is married and working, with family support, which leads to increased stability in her life and enables her to provide for her family and to attach to the community; (ix) she showed significant progress in pretrial supervision, "us[ing] this time wisely to show that she is a good candidate for rehabilitation." See Tr. at 18:10-21:1 (Court). The Court also noted, with reference to the § 3553(a) factors, that "I don't think a sentence up in the 51 range would provide just punishment" or "promote respect for the law. Tr. at 21:2-8 (Court). The Court found that those factors, taken together, pressed the sentence downward. See Tr. at 21:8-9 (Court).

The Court identified certain factors that put upward pressure on the sentence -- pressure that might keep the sentence within the Guideline range. See Tr. at 21:10-13 (Court). The Court first noted that it disagreed with Judge Gleeson's opinion that courts should consider costs; it noted that it had been putting together an opinion that would respond to Judge Gleeson's opinion, and stated that, although after Booker v. United States, 543 U.S. 220 (2005), and Williams v. New York, 337 U.S. 241 (1949), "there is probably not a factor that a Court can't consider," the Court nonetheless does not "consider [cost] to be a very legitimate factor for a Court to consider." Tr. at 21:13-21:24 (Court). The Court resisted Reyes' characterization of what it does in sentencing as a tax, noting that the Court is, instead,

> spending the money that's been appropriated to us by Congress, and while . . . I certainly recognize that our sentence[s] have costs and impact public policy, the sentencing is difficult enough, I think judges should probably work very hard to come up with a sentence that reflects the factors in 3553(a) and not try to get too far away from that.

Tr. at 21:24-22:7 (Court). The Court indicated that it did not believe that it should consider cost as a way of evaluating the kinds of sentences available, because that statutory factor asked what sorts of punishments "are available to promote the factors in 3553(a), not really get the Court

---

certain conditions of supervised release rather than incarceration, hence she is likely to be rehabilitated and not to relapse. See Tr. at 19:21-24 (Court).

drug into worrying about how it's going to be paid for. . . .  I think that primarily is the role of the political branch and the executive branch, rather than judges."  Tr. at 22:7-15 (Court).

Returning to Reyes, the Court listed the following factors: (i) the seriousness of the offense, particularly given that the amount of methamphetamine Reyes carried would impose a mandatory minimum, which reflects Congress' concern about this crime[7]; (ii) the sentence must promote respect for the law -- a two-edged sword in this case -- and (iii) the sentence must provide general deterrence, and, although Reyes may be correct that "nobody outside of this room may be concerned about what this sentence is," the Court must, nonetheless weigh "how its decision in this case and federal courts cumulatively, how their sentences generally deter this criminal activity that Congress has criminal[ized] and as long as it's criminal[ized] I think it's the federal Court's obligation to punish it as Congress has suggested," Tr. at 23:17-22 (Court); (iv) the need to provide a just punishment -- another two-edged sword, because the Court wants to provide a just punishment -- and (v) the need to promote respect for the law  both gave the Court some pause, because (vi) the Guidelines already incorporate some of the factors that push her sentence downward; (vii) she had two children when she engaged in this activity; (viii) the Court must recognize that it sentences many people with families for many different crimes, and that if the Court weights too heavily the impact on the family in individual cases, it will create sentencing disparities; and (ix) the Court noted the United States' error in the briefing, and stated that it was not clear what the attorney who prepared the brief "would have thought the bottom of the variance range should be if he had realized that it was a mistake.  He might have thought it was higher, he might have meant 30 regardless and maybe it is a typo.  But I don't know."  Tr. at

---

[7] The Court noted that it might respond to Judge Gleeson's criticisms of Sentencing Commission and of Congress' decision in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99–570, 100 Stat. 3207, 3207–2 to 3207–4 (codified in scattered sections of 18 U.S.C. and 21 U.S.C.)("ADAA"), in this Memorandum Opinion and Order.  See Tr. at 23:22-6 (Court).

22:16-25:13 (Court).  The Court indicated that it could justify that these factors balance in favor of a variance, but only slightly.  See Tr. at 25:13-16 (Court).  The Court said that one could justify the 41-month sentence that the United States had suggested, but stated that a variance was appropriate; the Court indicated that it had considered Reyes' request for a 15-month sentence, probation's original request for a 30-month sentence, and probation's final request of a 24-month sentence, and concluded that it could not justify pushing the sentence down that far.  See Tr. at 25:16-26:2 (Court).  The Court also stated that pushing the sentence to 30 months is, also, a stretch, but that it concluded that a sentence of "30 months is adequate to reflect the seriousness of the offense and promote respect for the law, and provide just punishment, afford adequate deterrence at both a specific and general level."  Tr. at 26:2-8 (Court).  The Court stated that it had not emphasized protecting the public, as its downward-pressure calculation indicated.  See Tr. at 26:8-10 (Court).  The Court stated that to go below this sentence would risk creating unwarranted sentencing disparities among similar defendants found guilty of similar conduct. See Tr. at 26:10-14 (Court).  The Court said that a variance is also appropriate because it provides Reyes needed education, training, and care to prevent this issue from recurring.  See Tr. at 26:14-19 (Court).  The Court concluded that the sentence better reflects the factors that 18 U.S.C. § 3553(a) embodies than the bottom of the Guideline range would, and that, although its task is not to come up with reasonable sentences, but to come up with sentences that reflect the 18 U.S.C. § 3553(a) factors, see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."(citation omitted)), it believed the sentence was reasonable and, perhaps most importantly, sufficient without being greater than necessary to comply with the

purposes of punishment set forth in the Sentencing Reform Act" of 1984, Pub. L. No. 98–473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.).  Tr. at 26:19-27:4 (Court).

The Court noted that certain sentencing factors in 18 U.S.C. § 3553(a)(1) warrant a sentence outside of the Guideline range.  See Tr. at 27:10-15 (Court).  The Court indicated that three statutory factors guided the Court's conclusion: the nature and circumstances of the offense, and the history and characteristics of the defendant, see 18 U.S.C. § 3553(a)(1); the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, see 18 U.S.C. § 3553(a)(2)(A); and the need to afford adequate deterrence to criminal conduct see 18 U.S.C. § 3553(a)(2)(B).  See Tr. at 27:15-23 (Court).  The Court noted that Reyes was nineteen years old when she committed the crime, that she is the primary caregiver for three children under the age of three, one of whom suffers from severe asthma, which sometimes requires urgent and frequent medical care, that she also is an important caregiver for her mother, who suffers from several significant health conditions.  See Tr. at 27:23-8 (Court).  The Court noted that Reyes dropped out of school after seventh grade, when she became pregnant with her first child, and also acknowledged that she had recently restarted her education -- attempting to obtain her GED -- but that she had discontinued her education after she suffered complications in her recent pregnancy.  See Tr. at 28:8-13 (Court).  The Court noted that, after her daughter's birth, Reyes began working and continues to work.  See Tr. at 28:13-16 (Court).  The Court also stated that Reyes has been complying carefully with the conditions of release and that she was making positive choices.  See Tr. at 28:16-18 (Court). Further, the Court emphasized that this offense is Reyes' first contact with the criminal justice system.  See Tr. at 28:18-20 (Court).  The Court, therefore, concluded that a sentence below the advisory Guideline range is reasonable and sufficient without being greater than necessary to

accomplish the sentencing goals that 18 U.S.C. § 3553(a) sets forth.  See Tr. at 28:20-25 (Court).

The Court noted that, "on or about June 21, 2012, Bernallillo County, New Mexico, the

defendant possessed with intent to distribute 500 grams and more of a mixture and substance

containing methamphetamine."  Tr. at 29:1-5 (Court).

Accordingly, as to indictment No. CR 12-1695-001 JB, the Court committed Reyes to the

Bureau of Prisons' custody for 30 months.  See Tr. at 29: 5-8 (Court).  The Court also placed her

on supervised release for two years, imposing the standard conditions of supervised release and

the following mandatory conditions: (i) the defendant shall not possess a firearm, ammunition,

destructive device or any dangerous weapon; and (ii) the defendant shall cooperate in the

collection of DNA as directed in the statute.  See Tr. at 29:8-15 (Court).  The Court also imposed

the following special conditions: (i) the defendant must participate in educational or vocational

program as approved by the probation officer; this special condition is imposed as it will assist

the defendant to develop marketable skills, to gain and maintain employment, and to reintegrate

back into society; (ii) the defendant must submit to a search of her person, property or

automobile under her control to be conducted in a reasonable manner at a reasonable time for the

purpose of detecting illegal substances, weapons or any other contraband at the direction of the

probation officer; (iii) the defendant must inform any residents that the premises may be subject

to a search; this special condition is imposed as the defendant was found to be in the possession

of illegal substances; (iv) the defendant must participate in and successfully complete an

outpatient mental health treatment program approved by the probation officer; the defendant may

be required to pay a portion of the cost of this treatment to be determined by the probation

officer; this special condition is imposed as the defendant reported having emotional difficulty

dealing with her miscarriage.  See Tr. at 29:15-30:14 (Court).  Based on Reyes' lack of financial

resources, the Court did not impose a fine.  See Tr. at 30:14-16.  The Court required, however, the defendant to pay a special assessment of $100.00, which was due immediately.  See Tr. at 30:16-17 (Court).  Upon the Court's request, neither counsel offered a reason that the Court should not impose the sentence as the Court stated it beyond that which they had already argued.  See Tr. at 30:17-23 (Court, Brawley, Winterbottom).  Accordingly, the Court imposed the sentence.  See Tr. at 30:23-25 (Court).[8]  After the Court advised Reyes of her appeal rights and Reyes stated that she understood, see Tr. at 30:25-32:6 (Reyes), the Court asked the USPO whether the Phoenix facility was appropriate for Reyes, and the USPO stated that it was.  See Tr. at 32:8-11 (Court, Probation Officer).  The Court, therefore, stated that it would make that recommendation and that, although it could only recommend to the Bureau of Prisons a particular designation, it had had success with that facility; Reyes understood that the Court could not guarantee that outcome.  See Tr. at 32:12-19 (Court).

The Court then asked the parties to discuss voluntary surrender, asking whether it had discretion or whether 18 U.S.C. § 3143(a) limited its discretion; the United States was not sure.  See Tr. at 32:20-25 (Court, Brawley).  The USPO stated that the statute would allow the Court to

---

[8] The draft transcript has a typographical error.  The draft transcript states:

17   . . . Left [sic]
18   me ask both counsel if they know of any
19   reason why the sentence should not be imposed as the
20   Court has stated it other than what has already been
21   argued to the Court.
22         MS. BRAWLEY:  No, Your Honor.
23         MR. WINTERBOTTOM:  No, Your Honor I are I
24   it is ordered that the sentence is imposed as the
25   Court has stated it.

Tr. at 30:17-25 (Court).  From the context, it is evident that the transcript should have recorded the Court as saying: "Alright, it is ordered that the sentence is imposed as the Court has stated it."  Accordingly, the Court will treat this statement as its own.

release Reyes if it were clearly shown why her detention would not be appropriate.  See Tr. at

33:1-9 (Probation Officer).  The Court asked the United States for its thoughts; the United States

stated that it was torn between the fact that it might be best for Reyes to start her sentence sooner

so it could end sooner and the opposing fact that she had traveled with family -- then outside the

courtroom -- from Arizona.  See Tr. at 33:12-20 (Brawley).  The Court asked for the applicable

legal standard; the USPO said, citing 18 U.S.C. § 3145(c), the issue was whether the United

States thinks there are exceptional reasons why Reyes' detention would not be appropriate.  See

Tr. at 33:21-34:3 (Court, Probation Officer).  The United States suggested that it would not

oppose release if the Court were to find exceptional circumstances, and asked the Court to put

those circumstances, if any, on the record, and noted its assumption that Reyes' counsel had

explained the consequences of failing to self-surrender to Reyes.  See Tr. at 34:5-12 (Brawley).

The Court asked for the USPO's view; the USPO stated that they would not oppose the Court's

conclusion if it found exceptional reasons to allow Reyes to self-surrender, but left the matter to

the Court's discretion.  See Tr. at 34:13-20 (Court, Probation Officer).  The Court stated that it

could find, by clear-and-convincing evidence, that Reyes will not flee, or endanger the safety of

other persons or persons in the community.  See Tr. at 34:21-24 (Court).  The Court conceded

that it had not had a chance to review the Tenth Circuit's or its cases on this provision, but given

the need to decide the issue, the Court found that the fact that Reyes has a new, young child for

whom she must care, coupled with her performance, justify the exceptional-circumstances

standard.  See Tr. at 34:24-35:12 (Court).  The Court stated that it would, therefore, find

exceptional circumstances present; it noted that it might come to a different decision if it had

more time to consider the issue, but given the need to decide the issue immediately, it would

make that finding.  See Tr. at 35:14-17 (Court).  The Court instructed Reyes to arrange for self-

surrender.  See Tr. at 35:17-20 (Court).

<u>ANALYSIS</u>

The Court does not share Judge Gleeson's policy disagreement with the drug trafficking Guideline ranges.  Given the importance of this issue in the nation's ongoing debate about drug policy and the importance of the issue to the defense bar generally, the Court will explain at some length why it does not share Judge Gleeson's views.  Most importantly for Reyes, because Court lacks a <u>Kimbrough v. United States</u> disagreement with the Commission's Guideline ranges for drug trafficking offenses, although the Court varies, it does so for reasons tied to the § 3553(a) factors and not to a policy disagreement with the Guideline ranges.  Further, the Court will not consider the costs of incarceration and supervised release in sentencing, because the factors in § 3553(a) do not clearly permit the Court to consider costs, and because those concerned about the fiscal implications of criminal justice policy should petition the other branches of government and should not ask the Court to consider such implications in sentencing an individual defendant.

I.     **THE COURT DOES NOT AGREE WITH JUDGE GLEESON'S SUBSTANTIVE <u>KIMBROUGH V. UNITED STATES</u> DISAGREEMENT WITH THE COMMISSION'S GUIDELINE RANGES FOR DRUG TRAFFICKING.**

A pair of recent opinions that Judge Gleeson has written has received considerable attention.  One opinion largely criticized mandatory minimums.  See <u>United Sates v. Dossie</u>, 851 F. Supp. 2d 478 (E.D.N.Y. 2012).  The other opinion criticized the Commission's Guideline ranges for drug trafficking offenses.  See <u>United States v. Diaz</u>, 2013 WL 322243.  The issues are related, but this Memorandum Opinion and Order primarily focuses on Judge Gleeson's drug trafficking opinion in <u>United States v. Diaz</u>.[9]  The reason that the Court takes some time to

_____
[9] While the Court need not discuss at length here Judge Gleeson's criticisms of

_____

mandatory minimum sentences in United States v. Dossie, the Court also does not have all that much to say about those criticisms.  While it is slightly interesting what federal judges have to say about mandatory minimums, their opinions are worth little more than the next citizens', and the bottom line is that federal judges are stuck with them.  If anything, federal judges' views are less interesting than others' opinions, because federal judges are hardly neutral players on the subject.  First, almost all judges like power and discretion, and mandatory minimums take discretion away; hence, many judges are hostile to mandatory minimums.  Second, mandatory minimums are implicitly, if not expressly, a criticism of how judges have exercised their discretion; judges tend not to like criticism.

It is difficult to assert that mandatory minimum sentences in drug trafficking cases distort the sentencing process when they are the sentencing process; it makes no more sense to say that pass interference distorts the passing game in football when it is a rule in the game of football.  Judge Gleeson's other criticism is more substantive: he joins other judges critical of mandatory minimums by pointing out that they have a front-row seat and have witnessed such mandatory minimums create injustice in their courts.  While the Court does not doubt that there are times when a mandatory minimum has resulted in harsh sentences, the Court is not convinced that as much injustice occurs as critics project.  The question is by what standard "unjust" is measured.  The people, and their elected members of Congress, may not consider mandatory sentences unjust.  That federal judges tend to sentence lower than the people might choose is underscored by the disparity Judge Gleeson identifies between the lower sentences historically imposed in drug cases, as the Commission originally calculated them, and the mandatory minimums that Congress imposed in the ADAA.

The Court is largely indifferent on mandatory minimums.  If Congress wants to give the Court more discretion and power, it is in no position to decline more responsibility.  On the other hand, if Congress wants to limit judicial discretion in sentencing, it is hardly worth a judicial temper tantrum.  Given the many complex issues that are already delegated to federal judges, it is hardly worth judicial breath or ink begging for a little more or complaining about a little less.  In the end, the issue is someone else's call, and the Court tends not to worry about things it can do nothing about.

It is worth noting, however, that there are sound reasons for mandatory minimums.  The Commission's report to Congress suggests the following as potential advantages: (i) "promoting uniformity and reducing unwarranted disparities," particularly after United States v. Booker, 543 U.S. 220 (2005); (ii) "[p]rotection of the [p]ublic through [c]ertainty in [p]unishment, [d]eterrence, and [i]ncapacitation:" (iii) they "express[] society's disdain for an offense;" (iv) because "[t]he threat of a mandatory minimum penalty gives law enforcement leverage over defendants, [they] may be encouraged to cooperate in exchange for lesser charges or safety valve and substantial-assistance benefits;" and (v) improving "the relationship  between state and federal law enforcement" in two ways: first, protecting the public by ensuring that the federal system will punish an offender when a state fails to impose a sufficiently high sentence, and, second, because "the prospect of being convicted of a federal statute carrying a mandatory minimum penalty induces defendants to plead to state charges."  United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 85-89 (Oct. 2011)(citing testimony, articles, and studies in support).  While there are disadvantages as well, see id. at 90-102, it is for the people and their representatives to balance them.

Finally, the Court rarely sees defendants receive a mandatory minimum sentence.  For

carefully consider Judge Gleeson's opinion in United States v. Diaz is that the defense bar presents his opinion often -- including in this case -- as a reason to vary from the Guideline's sentencing ranges in drug trafficking cases. Also, his view of sentencing harshness has been the subject of at least two editorials of which the Court is aware. See Adam Liptack, A Tough Judge's Proposal for Fairer Sentencing, N.Y. Times, May 29, 2012, at A17; Diane Dimond, Judges Seek to Correct Sentencing Injustice, Albuquerque J., Apr. 6, 2013, at A9. In fairness to the defense bar, the Court writes at some length here to explain its conclusion that it does not

---

example, the Commission's 2011 report to Congress on mandatory minimum penalties stated that, "[i]n fiscal year 2010, more than half (54%, n=8,619 of drug offenders convicted of an offense carrying a mandatory minimum penalty received relief from the mandatory minimum penalty." United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 158 (Oct. 2011). The reasons are multiple. First, Congress expressly provided for a safety valve. See 18 U.S.C. § 3553(f). If the defendant has a criminal history of I, among other factors, he or she can avoid the mandatory minimum. Thus, the only defendants who have anything to fear from mandatory minimum are those who have a criminal history and refuse to cooperate, among other factors -- not the most sympathetic set of drug trafficking defendants. Moreover, once the safety valve applies, the Court can continue to vary, thus largely eliminating the effect of a mandatory minimum in a particular case. See United States v. Garcia, 939 F. Supp. 2d 1216, 1227-28 (D.N.M. 2013)(Browning, J.) Second, under U.S.S.C. § 5K1.1, if the Court grants the United States' motion for substantial assistance, the sentence can be below the mandatory minimum; not only do mandatory minimums promote substantial assistance, but they give the DOJ the flexibility to do justice and avoid injustice in pretrial situations. Third, the United States can avoid injustice with its charging decisions; the Court often sees the original indictment includes a count that would result in a mandatory minimum, but at sentencing, the plea is to a lesser offense in an indictment or information, and the plea agreement calls for dismissal of the counts in the indictment resulting in a mandatory minimum. Indeed, the DOJ recently adopted a new charging policy that is designed to "ensure that our most severe mandatory minimum penalties are reserved for serious, high-level, or violent drug traffickers." Holder Memorandum at 1. Currently about the only people who see a federal mandatory minimum are those who roll the dice and decline to enter into a plea agreement. While the mandatory minimum gives the prosecution tremendous leverage, the mandatory minimum rarely has much practical effect in the early stages of the criminal justice process; it usually comes into effect only when the defendant makes a bad miscalculation.

The Court acknowledges the ongoing debate about mandatory minimums generally and that reasonable people may differ about their wisdom. Because Reyes is not subject to a mandatory minimum, the Court will discuss mandatory minimums only to the extent necessary to respond to Judge Gleeson's critique of the Guideline ranges based on the ADAA. The Court may, in a future case that implicates a mandatory minimum, weigh in on that debate.

share Judge Gleeson's belief that the Guideline ranges for drug trafficking offenses are flawed.

In United States v. Diaz, Gleeson critiqued at length the Guideline ranges in certain drug trafficking cases; indeed, he has declared that he will "place almost no weight on" the Guideline ranges in such cases, "because of [his] fundamental policy disagreement with the offense guideline that produces it."   2013 WL 322243, at *1, *5.[10]   The overarching theme of Judge Gleeson's opinion is that the Guideline ranges are too harsh relative to the culpability of many defendants.   The Court disagrees, largely because his criticisms are misguided in light of the limited role of the judicial branch in our constitutional scheme.

Judge Gleeson's Kimbrough v. United States disagreement with the Guideline ranges first surfaced in this case in Reyes' sentencing memorandum, where she cites United States v. Diaz, in which Judge Gleeson criticizes the "offense guideline for heroin, cocaine, and crack offenses" as "deeply and structurally flawed," because, in Judge Gleeson's words, "Congress made a mistake" when it enacted the ADAA.   2013 WL 322243, at *1, *5.   So too, in Judge Gleeson's view, did the original Commission err, when it made "the fateful choice . . . to link the Guidelines ranges for all drug trafficking defendants to the onerous mandatory minimum penalties" in the ADAA.   United States v. Diaz, 2013 WL 322243, at *1 (emphasis in original).

Reyes is not alone in her enthusiasm for Judge Gleeson's views.   Other drug trafficking

---

[10]   While the Court disagrees with Judge Gleeson's policy disagreement with the Guideline ranges, it does not in any way dispute that Judge Gleeson, under Kimbrough v. United States and Spears v. United States, has the right to disagree with the Guideline ranges and not give much weight to them in his sentencing decisions.   See Spears v. United States, 555 U.S. 261, 265-66 (2009)("[D]istrict courts are entitled to reject and vary from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."); Kimbrough v. United States, 552 U.S. at 101 (quoting with approval the United States' concession that, "as a general matter, 'courts may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the guidelines.'").   Thus, when Judge Gleeson disagrees with the drug trafficking guidelines because they are not based on empirical data, he is free to do so.   The Court does not dispute that Judge Gleeson has the power and authority to do what he did; the Court's disagreement is solely with Judge Gleeson's reasoning for what he did.

defendants who recently have come before the Court for sentencing have also, almost invariably, cited or discussed either <u>United States v. Diaz</u> or Judge Gleeson's earlier decision in <u>United Sates v. Dossie</u>, in which he fired his first volley of criticism at the ADAA.  These decisions have influenced the public dialogue about sentencing as well: Judge Gleeson's views about sentencing harshness have garnered both national and local media attention.  <u>See, e.g.</u>, Liptack, <u>supra</u> ("The Dossie case illustrates what some judges say is a common problem: Prosecutors' insistence on mandatory minimum sentences for minor players in the drug trade has warped the criminal justice system and robbed judges of sentencing authority.").  <u>See also</u> Dimond, <u>supra</u> (describing Judge Gleeson's other efforts to address sentencing harshness).

Judge Gleeson does not, however, speak for all of the federal bench.  The Court respectfully disagrees with Judge Gleeson's thoughtful and sincere critique of the current system.  The Court's fundamental disagreement with Judge Gleeson is his repeated assertion that Congress "made a mistake."   In the first place, unless the mistake is of constitutional dimension, <u>i.e.</u>, the statute is inconsistent with the Constitution, it is hard for a Court to say that Congress, the elected branch of our government, ever makes a "mistake."  Judges used to be more charitable to Congress and say that Congress acted such a way "in its infinite wisdom."  The Court does not presume to tell Congress that it made a "mistake"; on an issue of how long a sentence should be, it is hard for a judge to say that another judge's sentence is a "mistake."  It seems particularly hard for a judge to say, with any sound footing, that Congress made a mistake.  Further, in the Court's view, Congress did not make a mistake.

The Court also disagrees with Judge Gleeson's belief that the offense Guideline ranges for drug trafficking offenses are "deeply and structurally flawed," 2013 WL 32243, at *1, because, in his view, it is not based on empirical data, Commission expertise, or on the actual

culpability of defendants.  In the Court's view, the Commission's decision to defer to the ADAA as the decision of the people's elected representatives in constructing the Guideline ranges was wholly appropriate.

## II.  THE COURT DOES NOT SHARE JUDGE GLEESON'S ASSESSMENT OF CONGRESS' WORK IN THE ADAA.

The Court does not agree with Judge Gleeson's judgment about the ADAA's purpose.  As the Court has already indicated, the Court thinks that such an extended critique of Congress, although thoughtful, is outside the judicial branch's bailiwick.  Moreover, the Court is not convinced that Congress made a mistake, at least in the sense that Judge Gleeson identifies, in the ADAA.

### A.  JUDGE GLESSON'S ARGUMENT HINGES ON HIS VIEW THAT CONGRESS INTENDED MANDATORY MINIMUM SENTENCES "ONLY FOR A FEW."

In Judge Gleeson's view, drug trafficking sentencing under the ADAA suffers from a means-end mismatch.  In both United States v. Dossie and United States v. Diaz, Judge Gleeson identified the end as follows:

> The ADAA's five-year minimum sentence, with a maximum enlarged from 20 to 40 years (the "5-to-40 sentence enhancement" or the "five-year mandatory minimum"), was specifically intended for the managers of drug enterprises, while the Act's ten-year minimum sentence with life as the maximum (the "ten-to-life sentence enhancement" or the "ten-year mandatory minimum") was intended for the organizers and leaders.

United States v. Dossie, 851 F. Supp. 2d at 479.  See United States v. Diaz, 2013 WL 322243, at *4 (echoing this language).  Among other portions of the ADAA's legislative history, he pointed to then-Senate Minority Leader Robert Byrd's summary of a predecessor bill to the ADAA:

> "For the kingpins -- the masterminds who are really running these operations -- and they can be identified by the amount of drugs with which they are involved -- we require a jail term upon conviction.  If it is their first conviction, the minimum term is 10 years. . . .  Our proposal would also provide mandatory minimum

- 35 -

> penalties for the middle-level dealers as well.  Those criminals would also have to
> serve time in jail.  The minimum sentences would be slightly less than those for
> the kingpins, but they nevertheless would have to go to jail -- a minimum of 5
> years for the first offense."

United States v. Dossie, 851 F. Supp. 2d at 480 (quoting 132 Cong. Rec. 27, 193-94 (Sept. 30,

1986)).

Judge Gleeson criticized at length the method Congress chose to realize its goal: "[R]ight

from the start Congress made a mistake, which is apparent in the statement of Senator Byrd

quoted above: The severe sentences it mandated to punish specified _roles_ in drug trafficking

offenses were triggered not by role but by drug type and quantity instead."  United States v.

Dossie, 851 F. Supp. 2d at 480 (emphasis in original).  Rather than triggering enhanced five- and

ten-year statutory minimums based on the drug type and quantity involved in the case, Judge

Gleeson wrote that "Congress should have said that an offense gets the 5-to-40 sentence

enhancement when the defendant is proved to be a manager of a drug business," and that it

should have "hing[ed] the ten-to-life sentence enhancement on the government's proof of

'kingpin' or leadership status."  851 F. Supp. 2d at 480.

In United States v. Diaz, Judge Gleeson explained the central problem he perceives in the

ADAA: "drug quantity is a poor proxy for culpability."  2013 WL 322243, at *13.  He pointed to

reports from the DOJ and the Commission suggesting that those entities recognize this failing.

See 2013 WL 322243, at *13.  He argued that the Guidelines instead should focus on the

defendant's role in the crime; he explains that

> [t]he Guidelines take role into account, but not nearly enough.  Under §§ 3B1.1
> and 3B 1.2, an offender's base offense level may be increased or decreased by two
> to four levels based on his aggravating or mitigating role in the offense.  In other
> words, the Guidelines allow for up to eight levels of differentiation among
> offenders based on their role in the offense.  By contrast, it allows for up to 32
> levels of differentiation among offenders based on drug quantity.  Thus, a
> defendant whose offense involves heroin, cocaine or crack can receive a sentence

- 36 -

under the Guidelines ranging from less than a year (10 months) to more than 24 years (293 months) based solely on drug quantity.

2013 WL 322243, at *13 (footnotes omitted).  Judge Gleeson acknowledged that no workable Guideline could be sufficiently fact-sensitive to produce ideal sentences in every case; hence, he says, there will always be room for individualized judging.  See 2013 WL 322243, at *13.

> ### B.   CONGRESS DID NOT INTEND TO APPLY THE ADAA'S PENALTIES ONLY TO A FEW DRUG-TRADE KINGPINS.

The linchpin of Judge Gleeson's argument about the post-ADAA Guidelines is, therefore, that Congress expressly intended the mandatory minimums "only for a few."  2013 WL 322243, at *1.  It follows from this that Judge Gleeson believes that the Guideline ranges, which apply more broadly, are also too high. There are five problems with that argument.  First, the statute's language neither expressly or otherwise says it should apply only to a "few," which inquiry normally ends a federal court's statutory construction.  Second, the legislative history does not univocally suggest that Congress intended the mandatory minimums to apply only to a "few." Third, there is the difficult problem of defining the "few."  Fourth, there are sound reasons not to restrict the mandatory minimum to a "few."  Fifth, the mandatory minimum is, in the real world, applied to only a very "few."

The ADAA's language does not restrict its scope to a "few" or to "kingpins," as Judge Gleeson understands the term.  The point is obvious -- indeed, Judge Gleeson would not have occasion to criticize the ADAA if its language embodied the intent he ascribes to it.  The point is worth making, however, because federal judges generally do best when they confine their thoughts about legislation's wisdom to the pages of a law review article or a newspaper editorial.[11]  Because Judge Gleeson has weighed Congress' work and found it wanting, however,

---

[11] There is a fine line between legitimate policy-based disagreement with a discrete

the Court will explain why his reasoning is not sound.

To the extent that Judge Gleeson's opinion rests on legislative intent as the legislative history expresses it, the opinion rests on several unexamined and contested premises. As Associate Justice Antonin Scalia explains in a recent concurrence:

> I do not endorse . . . the Court's occasional excursions beyond the interpretive terra firma of text and context, into the swamps of legislative history. Reliance on legislative history rests upon several frail premises. First, and most important: That the statute means what Congress intended. It does not. Because we are a government of laws, not of men, and are governed by what Congress enacted rather than by what it intended, the sole object of the interpretive enterprise is to determine what a law <u>says</u>. Second: That there *was* a congressional "intent" apart from that reflected in the enacted text. On most issues of detail that come before this Court, I am confident that the majority of Senators and Representatives had no views whatever on how the issues should be resolved -- indeed, were unaware of the issues entirely. Third: That the views expressed in a committee report or a floor statement represent those of all the Members of that House. Many of them almost certainly did not read the report or hear the statement, much less agree with it -- not to mention the Members of the other House and the President who signed the bill.

> Since congressional "intent" apart from enacted text is fiction to begin with, courts understandably allow themselves a good deal of poetic license in defining it.

<u>Lawson v. FMR LLC</u>, No. 12-3, slip op. of Scalia, J., at 1-2 (U.S. Mar. 4, 2014), http://www.supremecourt.gov/opinions/13pdf/12-3_4f57.pdf.    If one takes this view of legislative history, Judge Gleeson's arguments about legislative intent as legislative history informs it are largely beside the point: nothing in the ADAA encodes in law the kingpin-only intent Judge Gleeson dredges up from the "swamp[] of legislative history."

This view of legislative history is not, of course, the only -- or perhaps even the dominant -- view that Supreme Court Justices hold.   Justice Breyer famously rejects Justice Scalia's

---

Guideline, like those that <u>Kimbrough v. United States</u>, 552 U.S. 85, recognizes federal judges may consider, and wholesale criticism of a major policy initiative by Congress. Federal judges are wholly competent in the first area, but when they venture into the second area, they run the risk of speaking not only out of turn, but out of their depth.

narrow view of the record for determining Congress' intent.  Indeed, he rejected that narrow view before he became a Supreme Court Justice, see generally Stephen Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S. Cal. L. Rev. 845 (1992), and regularly points to legislative history in his opinions, see, e.g., FTC v. Actavis, Inc., 133 S. Ct. 2223, 2234 (2013)(citing legislative history to interpret the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. 98–417, 98 Stat. 1585 (codified as amended in scattered sections of 21 and 35 U.S.C.), commonly known as the Hatch-Waxman Act).

Even if one accepts all the premises that undergird reliance on legislative history generally, the ADAA's legislative history does not support the narrow version of legislative intent that Judge Gleeson assigned to Congress.  In the first place, Senator Byrd's statement -- on which Judge Gleeson rests much of his claim -- does not support the notion that the mandatory minimums should apply only to a "few."  Senator Byrd said:

> For the kingpins -- the masterminds who are really running these operations -- and they can be identified by the amount of drugs with which they are involved -- we require a jail term upon conviction.  If it is their first conviction, the minimum term is 10 years.  If it is their second conviction, the minimum term is 20 years.  Again, let us remember, they would have to serve that amount of time, at a minimum, without any chance of parole. This new law would also provide that the judge, if he felt the circumstances warranted, could sentence them to a lot more time than that. In fact, the judge could see to it that they were locked up for life.
>
> Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well.  Those criminals would also have to serve time in jail.  The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail -- a minimum of 5 years for the first offense and 10 years for the second.  As is the case for the kingpins, those 5- and 10-year terms are only the mandatory minimums; the judge could, if he believes the circumstances dictate, sentence the middle-level drug dealer to 40 years for a first offense and life imprisonment for a second offense.  In no event would such offenders ever become eligible for parole.

132 Cong. Rec. 27, 193-94 (Sept 30, 1986).  Senator Byrd understood that the ADAA would

punish "kingpins," but also "middle-level dealers."   Judge Gleeson concludes that Congress intended to apply the ADAA's mandatory minimums to a "few" only after lumping together "middle-level dealers" with the "kingpins" to constitute the "few."   Senator Byrd did not, however, limit the ADAA's scope to a "few" or any other number of defendants.   Indeed, Byrd recognized that the ADAA includes a graduated, proportional form of punishment that targets not only "kingpins," but those who carry out the kingpins' business.[12]

Moreover, this floor statement from then-Senator Joseph Biden about a predecessor bill to the ADAA suggests that targeting smaller players in the drug trade was part of Congress' deterrence strategy:

> Any effective proposal to decrease drug abuse must involve strategies to reduce both the supply and demand for drugs. This legislation addressed both of these areas. On the supply side, this package provides for stronger new penalties for most drug related crimes, including mandatory minimum penalties for the king pins [sic] of the drug syndicates <u>and for those who sell their poisons to our children</u>.

132 Cong. Rec. § 14289 (daily ed. Sept. 30, 1986)(statement of Sen. Joseph Biden)("Biden Statement")(emphasis added).   Then-Senator Biden's statement contradicts Judge Gleeson's view that the harsh sentences under the ADAA were "intended <u>only</u> for managers and leaders of drug organizations,"   <u>United States v. Diaz</u>, 2013 WL 322243, at 1 (emphasis added).[13]   Then-Senator

---

[12]   In light of Congress' adoption of this graduated form of punishment -- that is, if a defendant carries more drugs, he will do more time -- the Commission's decision to apply the same approach across a broader range of defendants makes sense.

[13] This episode illustrates the perils of relying on legislative history to interpret statutes. As Chief Judge Alex Kozinski of the United States Court of Appeals for the Ninth Circuit once explained:

> Legislative history is often contradictory, giving courts a chance to pick and choose those bits which support the result the judges want to reach. In Judge Leventhal's immortal phrase, consulting legislative history is like "looking over a crowd of people and picking out your friends."   This shifts power from the

Biden instead indicated that the mandatory minimum penalties applied to those who distribute

drug the kingpins' goods and not just to the kingpins.  Accordingly, if one examines the ADAA's

legislative history, it does not univocally support Judge Gleeson's vision of the statute's intent.[14]

      Moreover, it is difficult to define, in any pragmatic way, the "few."  Judge Gleeson gave

no criteria by which we should decide whom those "few" are beyond the vague role-in-the-

offense and actual-culpability criteria, for which it would be difficult to draft a Guideline not

only for lawyers to use, but also for non-lawyer probation officers and non-lawyer defendants in

plea negotiations.  Predictability would be sacrificed without any concomitant gain.  Because

such a Guideline would be difficult to quantify and apply easily, it would be impossible to

predict their application, thereby undermining uniformity and making it difficult for people

entering into plea negotiations to rely on and apply each Guideline with any assurance.  Setting

the Guideline range on the basis of role would convert every plea negotiation into a mini-trial,

making hollow the notion of a Guideline.  And even if courts could provide or fashion a usable

definition of the term, it is not sound to limit the mandatory minimum to the few: it is difficult to

understand why, if Congress sets the benchmark of a mandatory minimum, and X number of

people qualify for that standard, federal judges -- whose power to sentence anyone comes

---

                Congress and the President -- who, after all, are charged with writing the laws --
                to unelected judges.

Hon. Alex Kozinski, Should Reading Legislative History be an Impeachable Offense?, 31
Suffolk L. Rev. 807, 813 (1998)(footnote omitted).

    [14] Further, the true "kingpins" are not generally in the United States, but are out of the
country, often, for New Mexico, in the Republic of New Mexico.  The Assistant United States
Attorneys for the District of New Mexico never call anyone in the federal courts a "kingpin."
The mandatory minimums would have dull teeth if Congress intended judges to apply them only
to those ensconced outside of the nation's reach.  The federal courts should not come up with an
interpretation of the ADAA that negates its language and the legislative history by saying it only
will apply to people in Mexico, outside the federal government's reach.

ultimately from Congress -- should apply the mandatory minimum to a few rather than to X.

Finally, the Court's experience has been that the mandatory minimum has generally been applied to those few offenders who refuse to plea or cooperate, rolling the dice with going to trial, and then being proved guilty.  The Court cannot speak for the experience of other federal judges; perhaps the United States Attorney's Office for the Eastern District of New York is more aggressive than the United States Attorney's Office for the District of New Mexico.  That difference does not, however, show that mandatory minimums are, themselves, the problem -- the problem is overly aggressive charging decisions.  The optimal solution to that problem may not be taking away mandatory minimums entirely, but less aggressive charging decisions, like those that the Holder Memorandum embodies.[15]

In the end, the Court believes that the other two branches are fully equipped to deal with any problems that the ADAA's mandatory minimums impose, either by legislation or by

---

[15] These comments reflect the Court's experience in a district with a heavy drug docket. In the District of New Mexico, during the twelve-month period that ended on March 31, 2013 -- the most recent period for which statistics of this sort are available -- 111 defendants in marijuana cases and 466 defendants in all other drug cases were commenced -- a total of 577 drug-offense defendants.  See U.S. Courts, U.S. District Courts -- Criminal Defendants Commenced, by Offense and District, During the 12-Month Period Ending March 31, 2013 at 6, http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics/2013/tables/D03DMar13.pdf ("District Court Statistics").  In contrast, in the Eastern District of New York, during the same period, five defendants in marijuana cases and 353 defendants in all other drug cases were commenced -- a total of 358 drug-offense defendants.  District Court Statistics, supra, at 2.  Moreover, the District of New Mexico has seven active judges and the Eastern District of New York has fourteen active judges.  These statistics do not undercut Judge Gleeson's different experience: the Court recognizes that Judge Gleeson has been on the bench longer than the Court has and that, before he took the bench, Judge Gleeson served as an Assistant United States Attorney for the Eastern District of New York for the better part of a decade.  See Federal Judicial Center, Biographical Directory of Federal Judges: Gleeson, John, http://www.fjc.gov/servlet/nGetInfo?jid=867&cid=999&ctype=na&instate=na.   The Court, instead, mentions these statistics to underscore that the Court's experience arises in a different part of the nation with a heavier drug docket and a lower number of judges to manage that docket.

changing charging decisions. [16]

### C.   NUMEROUS POLICY FACTORS INFORMED CONGRESS' DECISION TO APPLY THE ADAA'S HARSHER PENALTIES, NOT ONLY TO THE "FEW" "KINGPINS," BUT TO MORE MINOR PLAYERS AS WELL.

Taking at face value Judge Gleeson's policy arguments for tethering drug sentencing to individual culpability, his argument is not sound.   First, what sentence a given individual "deserves" for committing a given crime is, inherently, subjective.   Federal judges' voices in that debate are valuable, because those who work in the criminal justice system will have more contact with the defendants who go through that system than those who work outside of it will. Federal judges' perceptions of individual culpability are not, however, the only perceptions that matter, or that matter the most; the public's perceptions, as filtered through their elected representatives, matter more.

The ADAA did not come into existence in a vacuum: it came on the heels of the tragic death of Len Bias, which profoundly influenced the public's perception of drugs.   Bias, a star basketball player for the University of Maryland, died from a cocaine overdose only two days after the Boston Celtics selected him as the second overall pick in the 1986 NBA draft.   Writing a quarter-century later, in 2011, Jack McCallum of Sports Illustrated explained that, among the many reasons why Bias' story resonated, his cause of death was significant:

> The cause of death was puzzling and alarming.   Most of us who covered pro basketball at that time had some experience in writing about players and cocaine.

---

[16] It is also true that Congress has, by creating mandatory minimums, placed enormous power in prosecutors' hands.   One may justly criticize that allocation of power, but, in doing so, one should remember that, if sentencing discretion is to exist, it must exist somewhere.   Although one could argue that sentencing discretion belongs in the hands of an independent judiciary, because the executive branch will be tempted to use it for political reasons, one could also argue that such discretion belongs in the hands of a politically accountable branch, because an unaccountable judiciary could use its power unchecked by public will.   Such arguments are part of the fabric of American political life, and their resolution is best left to the branch best equipped to reflect the people's decision: the legislative branch.

But nobody, as far as we knew, had ever seized up and died from it suddenly, certainly not a college kid in the prime of life.

Jack McCallum, Sports Illustrated, Twenty-five years later, Bias' death remains a seminal sports moment (Sept. 1, 2011, 3:13 PM), http://sportsillustrated.cnn.com/2011/writers/jack_mccallum/06/17/len.bias/index.html.  Hence, when Congress made what Judge Gleeson called the "fateful" choice to enact mandatory minimums, there was a tangible reason: there was a public outcry. The public wanted what Judge Gleeson called "onerous" penalties.  To be sure, in a day when presidential candidates used hard drugs, see Barack Obama, Dreams From my Father 138 (2d ed. 2004), presidential candidates push for drug legalization, see Mike Riggs, reason.com, Gary Johnson on "Defanging the DEA, Pardoning Marijuana Offenders, and Standing with Occupy Wall Street (Oct. 19, 2011, 2:17 PM), http://reason.com/blog/2011/10/19/gary-johnson-on-defanging-the, and the DOJ refuses to enforce federal marijuana law in states whose laws regulate rather than outlaw marijuana, it may be hard for current lawyers to remember the public outcry that erupted after Bias' death.  But that outcry was real, and Congress responded in a way that, it thought, reflected the public's view of individual culpability -- not those of an enlightened legal elite.[17]

---

[17] In fact, the public response to actor Philip Seymour Hoffman's recent tragic death from a heroin overdose echoed this outcry.  The fact that eminent legal scholar and commentator Alan Dershowitz felt compelled to explain that those who sold Hoffman heroin should not be charged with murder demonstrates the disconnect between legal elites and at least some members of the public.  As Dershowitz explained:

It is easy to understand why the public demands homicide prosecutions against drug providers whose product caused the death of a beloved celebrity like Philip Seymour Hoffman.  A person lies dead; someone must bear responsibility for his death. It is easy to scapegoat the drug provider.  But is it fair to single out the provider whose heroin happened to have killed a celebrity (or anyone else)?

The answer is plainly no.

Even if one does not share Congress' view of individual culpability, other purposes of sentencing explain Congress' decision to apply the ADAA to couriers and not only to kingpins. To frame the broader picture, federal sentencing judges must consider the following familiar language every time they sentence a defendant:

> **(a) Factors to be considered in imposing a sentence.** -- The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
>> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>>
>> **(2)** the need for the sentence imposed --
>>
>>> **(A)** to reflect the seriousness of the offense, to promote respect for the law,

---

Alan Dershowitz, No, Philip Seymour Hoffman's Dealer Isn't a Murderer, The Daily Beast, (Feb. 7, 2014), http://www.thedailybeast.com/articles/2014/02/07/no-philip-seymour-hoffman-s-dealer-isn-t-a-murderer.html. The Court's point is that the strength of the public's reaction to how society should punish drug dealers may be cyclical, depending in part on how recently an admired public figure has died from an overdose. Indeed, Dershowitz recognized as much. See Dershowitz, supra (citing the deaths of Bias, comedian John Belushi, and Robert Kennedy's son as evidence that "[w]henever a celebrity dies of a self-administered drug, particularly heroin, efforts are made to locate and prosecute those who provided the drug").

Hoffman's is but the most recent high-profile death from drug abuse. In a video posted on the DOJ's website on the day that the Court filed this Memorandum Opinion and Order, Attorney General Holder called abuse of heroin and of prescription narcotics an "urgent -- and growing -- public health crisis," noting that "[b]etween 2006 and 2010, heroin overdose deaths increased by 45 percent" and detailing federal agencies' efforts to combat this trend. Dep't of Justice Office of Public Affairs, Attorney General Holder, Calling Rise in Heroin Overdoses 'Urgent Public Health Crisis, Vows Mix of Enforcement, Treatment (March 10, 2014), U.S. Dep't of Justice, http://www.justice.gov/opa/pr/2014/March/14-ag-246.html. Moreover, from the Court's experience, young people in the Northeast Heights of Albuquerque -- a relatively affluent area of New Mexico -- and young people in Espanola, New Mexico -- a relatively poor area of New Mexico -- are dying way too frequently from heroin. These facts bring into high relief an important fact about democracy: while the intensity of public interest on any issue in a democracy is difficult to maintain, diminished intensity does not mean that the attitude of the American public toward drug dealers -- even street dealers -- has fundamentally changed. And, given the widely acknowledged serious public health challenges that hard drugs present, harsh sentences for those involved in putting them on American streets -- and, ultimately, in Americans' bodies -- are understandable.

and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for --

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [or policy statements];

**\*\*\*\***

**(5)** any pertinent policy statement --

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

To be sure, some of these factors probe individual culpability.  See 18 U.S.C. 3553(a)(1), 3553(a)(2)(A).  Some of them, however, deal with distinct concepts, like deterrence and

uniformity.  See 18 U.S.C. 3553(a)(2)(B), 3553(a)(2)(C), 3553(a)(6).  Those considerations led Congress to the decision it made in the ADAA.  Congress believed that the law could disrupt the activity of kingpins by imposing severe penalties not only on the kingpins themselves, but also on their minions.  Then-Senator Biden's floor statement indicates that part of Congress' "supply side" strategy was to provide "mandatory minimum penalties for the king[]pins of the drug syndicates and for those who sell their poisons to our children."  Biden Statement at 1 (emphasis added).  The deterrence dimension of Congress' intent that Biden's statement reflects limits the significance of Judge Gleeson's observation that many drug trafficking offenders sentenced under the Guidelines are not managers or leaders.   Congress' goal was to end the kingpins' business, and one way to do that is to harshly punish, not only the kingpins, but also those who carry out their business.  Accordingly, Congress prescribed a higher minimum sentence than an individual defendant's culpability, standing alone, might warrant.

There is also the goal of uniformity.  Congress passed the Sentencing Reform Act that brought the Commission into existence only two years before it passed the ADAA.  It is widely understood that one purpose of the Sentencing Reform Act was to establish greater sentencing uniformity.  Although no member of Congress explicitly connected the ADAA's mandatory minimums with uniformity *qua* uniformity, Congress could reasonably conclude that courts' sentences would be more uniform if courts based their sentences on objective measurements of drug type and quantity, and not on inherently subjective perceptions of individual defendants' culpability.  Again, the point is not that the Court would have balanced these factors the same way; the point is that the Court does not see in Judge Gleeson's criticisms a reason to view Congress' choice as an unreasoned decision unworthy of judicial respect.

Reyes' argument that the Guidelines "are founded upon the theory that there is a direct

relationship between the quantity of drugs possessed and the significance of the possessor within the enterprise," Sentencing Memorandum at 5, suffers from the same problems. It may be true, as Reyes argues, that this rationale does not apply in the methamphetamine context, because it "is now manufactured by large efficient factories in Mexico which operate with little fear of apprehension," and with very low manufacturing costs. Sentencing Memorandum at 5. It may also be true, as Reyes asserts, that "[t]he cost of the drug to the owner is nominal and the cost of loss of any individual load transported by a courier is minimal," and that, "[a]s a result, very low level couriers can be entrusted with great quantities of methamphetamine without the quantity bearing any relationship to their importance to the organization." Sentencing Memorandum at 5. Further, it may be true that "[t]he risk to the organization is not the loss of the street value of methamphetamine, which may be fairly high. Rather, the risk for the organization is the cost of the product, which is very low." Sentencing Memorandum at 5. Reyes' argument rests, however, on the faulty premise that the Guideline ranges must reflect "the importance of the defendant" -- which, as Reyes uses it, seems to be another phrase for Judge Gleeson's "actual culpability" criterion. The premise is faulty, because Congress is entitled, very legitimately, to consider more than one factor -- and factors other than actual culpability, like deterrence and uniformity.

It may also be true, as Reyes suggests, that sentencing couriers based on the quantity that they carry is inappropriate, because the cost of any particular amount of methamphetamine is minimal and the courier bears the cost of the sentence, not the drug organization. Congress evidently concluded that it could deter the kingpins' acts by deterring couriers from carrying out their business. That choice may lead to harsh sentences in individual cases, but the drug problem

is serious, and it may take harsh sentences to end the trade.[18]

While Judge Gleeson is of the view that the current regime is insufficiently tethered to individual culpability, Congress has, in fact, shown the capacity to remedy sentencing harshness. As Judge Gleeson pointed out, it did so in the "safety valve" statute and the Fair Sentencing Act of 2010.  United States v. Diaz, 2013 WL 322243, at *7.  Those adjustments are not substantial enough for him.  See, e.g., United States v. Diaz, 2013 WL 322243, at *7 n.58 (stating that the criminal-history condition for safety valve relief is "unnecessarily rigorous").  He admitted they are "commendable in spirit," but vividly characterized them as "gnats around the ankles of the elephant," because they do not significantly lower the sentences of enough low-level offenders. United States v. Diaz, 2013 WL 322243, at *7.  "Gnats" or not, the existence of those provisions indicates Congress is capable of addressing the problem Judge Gleeson perceives.  That those who agree with him have not yet persuaded their fellow citizens to deal with the "elephant" of the current Guideline ranges is not a sound reason for the Court to demote that "elephant" to a status deserving "almost no weight."

It bears emphasis that none of the foregoing demonstrates that Congress made the best choice in the ADAA.  One can imagine a sentencing system without mandatory minimums or their downstream consequences in the Guideline ranges.  And the federal courts might have such a system eventually, given the increased momentum among commentators and politicians to eliminate mandatory minimums.  See George F. Will, The sledgehammer justice of mandatory

---

[18] The Court also notes Reyes' argument that she "is a naive, essentially harmless person," and that she has never "been subject or even aware of the extraordinary severity of federal drug crime sentences."  Sentencing Memorandum at 9.  To the extent that Reyes intends, with this suggestion, to argue that the federal drug sentencing law was too opaque to deter her conduct, although that is unfortunate, it is not a reason not to apply that law.  It might, somewhat perversely, be a reason to impose a higher sentence, insofar as § 3553(a) requires the Court to consider the sentence's effect on deterrence.  See 18 U.S.C. § 3553(a)(2)(B).

minimum        sentences   The       Washington      Post,      (Dec.     25,      2013),

http://www.washingtonpost.com/opinions/george-will-the-sledgehammer-justice-of-mandatory-

minimum-sentences/2013/12/25/959e39de-6cb2-11e3-a523-fe73f0ff6b8d_story.html;         Jacob

Sollum, Rand Paul: "I Am Here To Ask That We Begin The End Of Mandatory Minimum

Sentencing"   Forbes,    (Sept.  18,  2013,  1:31  PM),   http://www.forbes.com/sites/

jacobsullum/2013/09/18/rand-paul-i-am-here-to-ask-that-we-begin-the-end-of-mandatory-

minimum-sentencing/.   The point is, however, that Judge Gleeson's argument that Congress

"made a mistake" because it created a means-end mismatch is misguided, for two reasons: (i)

Congress, responding to a national outcry from the public following a public figure's tragic

death, could view individual culpability differently than federal judges do more than a quarter-

century later; and (ii) individual culpability is just one factor among many in the sentencing-

policy calculus, and Congress was entitled to -- and did -- weigh other factors, including

deterrence and uniformity, in designing sentencing policy.  The Court is not so bold as to say that

Congress "made a mistake"; Congress was entitled to act according to its own balancing of those

factors and not the Court's or Judge Gleeson's balancing of those factors.

## III.    THE COURT DOES NOT AGREE THAT THE COMMISSION'S GUIDELINE RANGES ARE STRUCTURALLY FLAWED.

While Judge Gleeson used different words to describe the alleged flaw that he perceives

with the Guideline ranges, there appears to be only one -- a structural flaw.  By structural flaw,

Judge Gleeson appears to mean that the current Guideline ranges are not based on empirical data,

on Commission expertise, or on the actual culpability of defendants.  The Court will therefore

address all three of these structural flaws that Judge Gleeson has identified separately and

conclude that none of these alleged flaws are flaws, structural or otherwise.

A.     JUDGE GLEESON ARGUES THAT THE COMMISSION FAILED TO BASE ITS DRUG TRAFFICKING GUIDELINES ON EMPIRCAL DATA.

Judge Gleeson first identified tension in the philosophical views that undergird the Guidelines -- specifically, clashes between the "just deserts" and deterrence approaches to criminal punishment, and between uniformity and proportionality as goals of sentencing.  See United States v. Diaz, 2013 WL 322243, at *4.  He quoted the Guidelines Manual's account of the Commission's efforts to harmonize these tensions: "In its initial set of guidelines, the Commission sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice."  United States v. Diaz, 2013 WL 322243, at *4 (quoting U.S. Sentencing Guidelines Manual § 1A.1.3 (1987)).

In Judge Gleeson's account, this empirical approach broke down in drug trafficking cases after Congress passed the ADAA -- as he calls it, "Congress's Curveball to the Original Commission."  United States v. Diaz, 2013 WL 322243, at *4.  As he acknowledged, "[t]he ADAA's mandatory minimum sentences . . . were far more severe than the average sentences previously meted out to drug trafficking offenders."  United States v. Diaz, 2013 WL 322243, at *5.  According to Judge Gleeson, "[t]he problem for the Commission was that it might not look right for a defendant to have a Guidelines range significantly lower than the minimum sentences mandated by Congress in the ADAA."  United States v. Diaz, 2013 WL 322243, at *5.  He suggests that the Commission could have solved this problem in two ways: by simply stipulating that a mandatory statutory minimum trumps the Guideline ranges or by incorporating the ADAA into the Guideline ranges by tying the Guidelines' role-in-the-offense adjustments to the statutory minimums.  United States v. Diaz, 2013 WL 322243, at *5.

Judge Gleeson continued: "The Commission made neither of these choices.  Instead, it

made one of the most important decisions in its history: It jettisoned its data entirely and made the quantity-based sentences in the ADAA proportionately applicable to *every* drug trafficking offense." United States v. Diaz, 2013 WL 322243, at *5 (emphasis in original). Judge Gleeson decried what he believed to be the Commission's murky justifications for this decision:

> The original Commission was far from forthright about the role of its own data in formulating Guidelines ranges for drug trafficking offenses. The Introduction to the first Guidelines Manual contained the opaque understatement that the ADAA "suggest[ed] or require[d] departure" from that data by "impos[ing] increased and mandatory minimum sentences." But the Commission otherwise failed to discuss or explain this momentous decision.

United States v. Diaz, 2013 WL 322243, at *6 (footnotes omitted).

In Judge Gleeson's view, this error led to "a significantly more punitive sentencing grid than Congress intended in passing the ADAA." United States v. Diaz, 2013 WL 322243, at *6. According to his calculation, "[t]he overwhelming majority of drug trafficking offenders are neither managers or leaders -- in Fiscal Year 2011, roughly 93% of drug trafficking offenders did not fall into either of those leadership categories."[19]

Judge Gleeson wrote that the resulting Guideline ranges in drug trafficking cases suffer from dramatic problems. According to him, the recommended sentences are not, and have never been, "heartland" sentences, because the Commission discarded its information about drug trafficking sentences after Congress passed the ADAA. United States v. Diaz, 2013 WL 322243, at *7-9. Further, according to Judge Gleeson, the data show that judges have departed downward far more frequently than upward -- and in increasing proportion over time. United States v. Diaz, 2013 WL 322243, at *8. Judge Gleeson believed that, by failing to revise the Guidelines in

---

[19] He arrived at this percentage by "comparing the number of drug offenders for heroin, cocaine, and crack offenses who did not receive an aggravating role adjustment against the total number of drug offenders for these drug types." United States v. Diaz, 2013 WL 322243, at *6 n. 50.

accordance with that experience, the Commission has "violated its statutory duty to promulgate Guidelines reflecting application experience and 'advancement in the knowledge of human behavior.'"  United States v. Diaz, 2013 WL 322243, at *8-9.

To encourage the Commission to make the changes he endorsed, Judge Gleeson pointed to instances where Congress has "t[aken the Commission] to the woodshed" when it has disagreed with the Commission.  United States v. Diaz, 2013 WL 322243, at *9.  For example, he pointed to the Feeney Amendment to the PROTECT Act as an example of a "humiliating rebuke of the Commission" in which "Congress simply bypassed the Commission altogether, making sweeping amendments to the Guidelines by legislation."  United States v. Diaz, 2013 WL 322243, at *9 & nn.75-77.  In sum, Judge Gleeson stated that the Guidelines are too severe; that judges do not respect them for that reason; that the Commission should, therefore, revise them; and that, while they do so, "because real people, families, and communities are harmed by the current ranges, it should immediately lower them by a third."  United States v. Diaz, 2013 WL 322243, at *9.

Turning to a broader policy concern as "[p]erhaps the best indication that the Guidelines ranges for drug trafficking offenses are excessively severe," Judge Gleeson cited "the dramatic impact they have had on the federal prison population *despite* the fact that judges so frequently sentence well below them."  United States v. Diaz, 2013 WL 322243, at *10 (emphasis in original).  He recited numerous statistics demonstrating the cost of the nation's current system and said that federal policy makers have failed to deal with the substantial expense associated with the increase in prison population.  See United States v. Diaz, 2013 WL 322243, at *10-11.  Judge Gleeson suggested that adjusting "[t]he drug trafficking offense guideline is a good place to start" addressing these costs:

> Based on a principle of abstract proportionality to the ADAA, it produces excessively long prison terms. If our drug trafficking offense sentences were based instead on empirical data, application experience, and a clear-eyed focus on getting the most bang for our incarceration buck, we would incarcerate fewer people for far less time.

2013 WL 322243, at *11.

As a remedy to these problems, Judge Gleeson said: "[T]he answer is simple.  The Commission should de-link the drug trafficking sentencing grid from the ADAA's weight driven mandatory minimum sentences and reduce the Guidelines ranges for these offenses."  2013 WL 322243, at *11.   In his view, "[t]he Commission [s]hould [r]evise the [d]rug [t]rafficking [g]uidelines to [b]etter [r]eflect a [d]efendant's [t]rue [c]ulpability."  2013 WL 322243, at *11. He explained:

> Drug quantity is not irrelevant in assessing a drug trafficking defendant's culpability, and there is nothing inherently wrong in the Guidelines taking drug quantity into account. If all else is equal, a dealer who sells 50 kilograms of heroin inflicts more harm on society, and deserves greater punishment, than one who sells one kilogram. But two drug trafficking cases are rarely alike in all respects except quantity. Numerous factors distinguish one drug offender's culpability from another. What was the defendant's role? What was his compensation? Did he have a proprietary interest in the drugs? How long was he involved in drug trafficking? Why did he get involved to begin with? Did he stop because he was arrested or for some other reason?

2013 WL 322243, at *12.  For that reason, he said, "[d]rug quantity rarely has the dominant effect that Congress and the Commission have ascribed to it, especially when it comes to determining the culpability of couriers and other low-level offenders."  2013 WL 322243, at *12. He suggested that the Guideline ranges should take role into account to a greater degree than they currently do.  See United States v. Diaz, 2013 WL 322243, at *13-14.

Judge Gleeson disagreed with the Commission's stated justifications for declining to revise the Guideline ranges.  United States v. Diaz, 2013 WL 322243, at *14.  As he described the Commission's reasoning:

First, it insists that it is merely fulfilling the Congressional mandates to promulgate Guidelines that are "consistent with all pertinent provisions of federal law," and to consider "the community view of the gravity of the offense." Second, it claims that the Guidelines "provide[] for graduated, proportional increases based on drug quantity for the full range of possible drug types and quantities," which is another way of saying that it avoids "sentencing cliffs." Finally, the Commission holds that the Guidelines reflect its "concurrence with Congress's judgment that the quantity of drug involved in an offense is an important measure of the seriousness of the offense and the culpability of the offender."

United States v. Diaz, 2013 WL 322243, at *14 (footnotes omitted).[20]

To the Commission's first point, Judge Gleeson replied that the Commission's statutory duty "to establish Guidelines that fulfill the purposes of sentencing set forth in § 3553(a) and that 'reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process'" is as much a part of federal law as the ADAA, and that "[o]ver twenty-five years of application experience have demonstrated that the drug trafficking offense guideline is unnecessarily severe and produces unjust outcomes." 2013 WL 322243, at *14. He also rejected the Commission's view that, by linking the Guideline ranges to the ADAA, the Guideline ranges reflect "the community view of the gravity of the offense," as 28 U.S.C. § 994(c)(4) requires. 2013 WL 322243, at *15. Judge Gleeson gave two reasons for that conclusion. First, the same subsection distinguishes between "the community" and "the Nation as a whole," 28 U.S.C. § 994(c)(7); in Judge Gleeson's view, this distinction "preclude[es] the Commission's interpretation of 'the community' as a proxy for Congress." 2013 WL 322243, at *15. Second, in his view, "Congress explicitly intended the mandatory minimums to apply only to managers and leaders of drug organizations," and the Commission erroneously applied them

---

[20] "A [sentencing] cliff arises where a trivial change in drug quantity has a substantial effect on sentence." U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 49-50 (2004)("2004 Report"). The idea, then, is that X drug quantity would trigger a substantially higher sentence than X-1.

across the board.  2013 WL 322243, at *15.  In Judge Gleeson's view, "the Guidelines would be more consistent with the 'community view' of the seriousness of drug offenses if they pegged offense level to role, and other factors denoting culpability, rather than drug quantity."  2013 WL 322243, at *15.

Judge Gleeson also rejected the Commission's second justification.  In his view, while the Guideline ranges avoid "sentencing cliffs" if those "cliffs" are measured along the dimension of drug type and quantity, measuring the same Guideline ranges in terms of individual culpability would reveal "terrain that is actually quite treacherous."  2013 WL 322243, at *15.  He suggested a possible solution to this problem: A prosecutor should only charge a defendant with higher quantities when the defendant is in fact a manager or leader of a drug operation.  See United States v. Diaz, 2013 WL 322243, at *15.[21]

Judge Gleeson rejected the Commission's third rationale -- that it agrees with Congress about quantity as a proxy for culpability -- because, in his view, the connection between the two has been "debunked," and the Commission has admitted as much.  2013 WL 322243, at *16.  Further, Gleeson suggested that the Supreme Court's decision in Kimbrough v. United States gave the Commission enough leeway in designing the Guideline ranges that they could address this problem:

> Congress has never mandated, directly or indirectly, that the Guidelines for drug trafficking offenses be tied to drug quantity. The Supreme Court reached that conclusion in Kimbrough[ v. United States], rejecting an argument that the Guidelines for crack trafficking offenses had to mimic the 100-to-1 ratio of mandatory minimum sentences for crack and powder cocaine offenses then in effect. The ADAA, the Court held, "mandates only maximum and minimum sentences," but "says nothing about an appropriate sentence within these brackets." Accordingly, the Court found that neither the Commission nor

---

[21] Judge Gleeson made a similar proposal in United States v. Dossie, 851 F. Supp. 2d at 479.  As of the time United States v. Diaz was published, that proposal had gone unanswered. United States v. Diaz, 2013 WL 322243, at *5 n.38.

sentencing courts were required "to adhere to the 100–to–1 ratio for crack cocaine quantities other than those that trigger the statutory mandatory minimum sentences." The Commission is similarly at liberty to craft Guidelines ranges that take into consideration factors that more accurately reflect the culpability of drug trafficking offenders.

2013 WL 322243, at *16 (footnotes omitted).

Judge Gleeson concluded with suggestions for the future content and tone of the debate. He suggested that the Commission's decision to adhere to its current Guidelines inhibits "[d]ialogue with the judiciary and Congress." 2013 WL 322243, at *16. He encourages more conversation between the Commission, sentencing judges, and Congress. 2013 WL 322243, at *16. In particular, he pointed to several unsuccessful efforts by members of the judiciary to communicate to the Commission their disagreement about the Guidelines. See 2013 WL 322243, at *16-17. Judge Gleeson also sharply criticized the Commission's observations about apparent racial sentencing disparities in the post-Booker v. United States era of increased discretion, arguing that the apparent disparity is based on a flawed study and that the introduction of race has poisoned the debate. See 2013 WL 322243, at *18.

### B.   THE COURT DOES NOT AGREE THAT THE COMMISSION'S GUIDELINE RANGES ARE STRUCTURALLY FLAWED BECAUSE THEY ARE NOT BASED ON EMPIRICAL DATA.

Judges and defense counsel frequently charge that a Guideline range is not based on empirical data and that, therefore, courts should not apply the Guideline range. By this criticism, judges and defendants appear to mean that the Commission did not do some of the work that the Commission did originally in setting some of the early Guideline ranges:

In its initial set of guidelines, the Commission sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice. It analyzed data drawn from 10,000 presentence investigations, the differing elements of various crimes as distinguished in substantive criminal statutes, the United States Parole Commission's guidelines

and statistics, and data from other relevant sources in order to determine which distinctions were important in pre-guidelines practice. After consideration, the Commission accepted, modified, or rationalized these distinctions. . . .

The Commission emphasizes that it drafted the initial guidelines with considerable caution.  It examined the many hundreds of criminal statutes in the United States Code.  It began with those that were the basis for a significant number of prosecutions and sought to place them in a rational order. It developed additional distinctions relevant to the application of these provisions and it applied sentencing ranges to each resulting category. In doing so, it relied upon pre-guidelines sentencing practice as revealed by its own statistical analyses based on summary reports of some 40,000 convictions, a sample of 10,000 augmented presentence reports, the parole guidelines, and policy judgments.

U.S. Sentencing Guidelines Manual § 1A1.3, at 4 (Nov. 2012); id. § 1A1.5, at 11.

Judge Gleeson appears to argue that, when the Commission incorporated the ADAA's quantity-based approach into the Guideline range, it exacerbated the flaw in Congress' reasoning.[22]  It is true that the Commission did not gather the empirical data it would have in setting other ranges.  It is not clear, however, that this failure to base the ranges on empirical research is a flaw.

It is important to understand what the Commission did in response to the ADAA: it "drafted a drug trafficking guideline that 1) generally measures the applicable amount based on the weight of the mixture or substance, and 2) linked the quantity levels in the ADAA to guideline ranges corresponding to the five- and ten-year mandatory minimum sentences."  2004 Report at 49.  Put differently, the Commission took as given the quantity-based mandatory minimums, and created proportionally shorter or longer Guideline ranges, for lesser or greater

---

[22] While Judge Gleeson most often stated that he disagreed on policy grounds with the Guideline ranges for drug trafficking offenses because they are not based on empirical data, he also says that they are not based on "national experience."  2013 WL 322243, at *1.  Judge Gleeson does not say what he means by "national experience" or how the phrase differs from empirical data, but given the empirical data that the Commission generally collects was based on national experience, the two phrases appear to be describing the same activity, and the Court will treat them as synonyms.

quantities of drugs.  It is true that, at the time, the Commission did not explain "why the Commission extended the ADAA's quantity-based approach in this way," 2004 Report at 49, but there are several plausible explanations.  As the Commission subsequently explained:

> One explanation for the commission's approach is the need to provide a full range of quantities and penalties to achieve proportionality in drug sentencing.  Under this view, drug type and quantity are reasonable first measures of the *harm* for which a drug trafficker should be held accountable.  Another possible reason for the Commission's approach was to avoid sentencing cliffs. . . .  For example, if the Drug Quantity Table contained only the two thresholds found in the ADAA, an increase from 499 to 501 grams of powder cocaine could result in a dramatic increase in punishment, just as it does under the mandatory minimum statutes.  The drug trafficking guideline provides more finely tuned distinctions among offenses and, therefore, more incremental increases in punishment.

2004 Report at 49-50 (emphasis in original).  There are reasonable arguments against using drug quantity as the basis for sentencing length.  See 2004 Report at 50-52.  Judge Gleeson identified some of those arguments.  These policy arguments miss, however, an important reason why the Commission adopted quantity as its shorthand for how much punishment a defendant deserves, one so obvious its critics often miss it: Congress chose that shorthand in the ADAA, and the Commission thought it wise to create Guideline ranges that reflected the public's endorsement of that decision.

Against that backdrop, it is now easy to understand why the Commission departed from its usual data-driven approach.  First, there was no need for empirical data; indeed, collecting further empirical data would have wasted the Commission's time, effort, and resources.  The Commission had already done empirical research; the problem is that any such empirical data would have measured sentencing practice that, in the public's mind as Congress reflected it, was flawed, because it did not punish drug offenders severely enough.  Thus, it is not sound to criticize the Commission for not doing more empirical research when the empirical research

would only have measured sentencing practice that the people rejected -- and would, therefore, have ignored the political processes that rejected the sentencing practice that the empirical research would have measured.  In the end, while the criticism of the Commission for not doing more empirical research sounds like a scientific criticism, it is no more than a dressed-up criticism of the high ranges with which many judges and defendants disagree -- the ranges are, in their opinion, just too high.  In fact, in a democracy, the Commission had no choice but to respond to the people's will in the ADAA; harsh criticism of the Commission for doing its duty and what was right in a republican form of government is unfair.

Second, while judges and defendants often criticize some Guideline ranges for failure to be based on empirical data, they rarely explain why the lack of empirical data is so bad.  The Court is quick to note how appreciative it is for all of the empirical research that the Commission has done and the way it has done it.  The Commission's solid and extensive work has given judges confidence, when they consider a given Guideline range, that the range reflects the public's expectations as much as possible.  Also, by drawing from such a large pool of information, the empirical data is about as democratic as empirical data can be.  On the other hand, the Constitution envisions a republican form of government.  If a court has to choose between empirical data and the judgment of the people's elected representatives that the empirical data would have measured overly lenient sentencing practice, it would seem that the more logical choice would be to honor the charge of the elected officials than the mechanical product of empirical data.  It would seem best, in a republican form of government, to trust the representatives' decision rather than the product of empirical data.  Thus, the burden falls on those who praise empirical data, and criticize every Guideline range when there is not sufficient empirical data to support the range, to show why they prefer empirical data rather than the

decision of the people's representatives.  Judge Gleeson does not meet that burden.

This same basic misconception of the relationship between the Commission and Congress permeates Judge Gleeson's opinion.  Judge Gleeson characterized the Commission's "problem" as being that "it might not look right for a defendant to have a Guideline range significantly lower than the minimum sentences mandated by Congress in the ADAA."  United States v. Diaz, 2013 WL 322243, at *5.  The Court is inclined to adopt a more charitable explanation for the Commission's behavior: it responded to the will of the people, as their representatives' acts reflect.

In short, Judge Gleeson seems to have overlooked a very good reason for the Commission's decision: its previous data had value because it summarized sentencing practice under the law at the time.  In the ADAA, Congress rejected that prior sentencing practice in the drug arena, so sentencing practice under prior law no longer revealed anything relevant.  When Congress changed the law, it rendered obsolete the Commission's research regarding sentencing under earlier law.  Out of respect for Congress, the Commission changed course.  That change is as it should be.

C.      **THE COMMISSION USED ITS EXPERTISE -- NOT ITS EMPIRICAL EXPERTISE, BUT ITS EXPERTISE IN RESPONDING TO CONGRESSIONAL INTENT.**

Judge Gleeson's second alleged structural flaw is that the Guideline ranges for drug trafficking offenses are not based on Commission expertise.  Judge Gleeson does not fully explain what this phrase means.  Presumably, it means that the Commission did not base its ranges on empirical data.  If empirical data is all that Judge Gleeson means, then the alleged structural flaw is redundant.

In any case, the Commission used its expertise in arriving at its post-ADAA Guideline

ranges.  At the time Congress passed the ADAA, three Commissioners were federal judges; then-Judge Stephen Breyer, of course, went on to become an Associate Justice of the Supreme Court. Three came from academia: two were law professors, and the third was an associate professor of management and economics.  The seventh member had served as a regional parole commissioner.  Each lawyer no doubt took constitutional law and, perhaps, at the undergraduate level, took political science classes.  No doubt the non-lawyers were schooled in civics lessons over the years.  All no doubt appreciated that Congress is the legislative branch of the national government, elected by the people.  They no doubt appreciated -- more than critics of the Commission's actions apparently do -- that when Congress expresses its will or thoughts, even if its action is not binding law, it is not a good idea in a democracy or republican form of government to cavalierly ignore that expression.  In fact, it is probably a good idea in the nation's form of government for the Commission to respond and not resist.  Also, the Commission and its staff -- who have to work more closely with Congress than the individual sentencing judges throughout the country -- know that thumbing one's nose to Congress may have political and economic consequences for the Commission.  If one is a federal agency, it is not a good idea to ignore Congress, get in a fight with Congress, or go off on one's own path for some ideological or philosophical reason, however well-intentioned the disagreement.  In the end, doing empirical research is not the only expertise the men and women of the Commission bring to the job; listening to the people through Congress is also an expertise.  The Commission used its expertise in this situation and was right to do so.

> **D.   THE COMMISSION WAS RIGHT NOT TO TRY TO REST BASE OFFENSE LEVELS ON SOME VAGUE NOTION OF "ACTUAL CULPABILITY OF DEFENDANTS."**

Judge Gleeson's third alleged structural flaw is that the Commission did not base the

Guideline ranges for drug trafficking on "the actual culpability of defendants."   2013 WL 322243, at *1.   He contends that the Guideline ranges are driven by drug type and quantity, which are poor proxies for culpability.

   "[T]he actual culpability of defendants" is an extremely vague notion.   As the Court has already explained, judges and parties can differ greatly over this idea in a particular case, much less as an idea that should provide guidance for judges throughout the country presiding over a vast array of cases.   To set base offense levels based on the "actual culpability of defendants" is to argue for no guidance and for no uniformity.   To require a mini-trial on complex factual details to determine the "actual culpability of defendants" in each sentencing just to get the base offense level is unrealistic; moreover, the results would be unpredictable.   While imperfect, drug and quantity are about as good a proxy for culpability as can be devised.

   For example, society does not get as worked up about marijuana as it does about heroin, cocaine, and methamphetamine.[23]   Distinguishing between drug type is a good first step to determining the seriousness of the crime -- the first factor that the Court must consider under 18 U.S.C. § 3553(a).   Second, society does not care as much about possession of any drug for private use as it does about possession of large quantities for potential distribution.   Accordingly, quantity is also a good indicator of the seriousness of the crime.   The Court is not concerned that type of drug and quantity are as poor proxies for culpability as Judge Gleeson.   Indeed, the Court

---

   [23]   This observation seems particularly true in light of the DOJ's recent policy announcement not to spend its resources going after the marijuana dealers and growers who are acting consistent with Colorado's new marijuana laws.   See Colleen Curry, Marijuana Ruling Could End Prohibition on Pot, ABC News, (Aug. 31, 2013), http://abcnews.go.com/US/marijuana-ruling-signal-end-prohibition-pot/story?id=20118755. This decision not to prosecute wealthy large-scale Anglo distributors in Colorado -- on New Mexico's northern border -- calls into question whether the Court should mete out large sentences to poor backpackers from Mexico -- on New Mexico's southern border -- bussing over bundles of marijuana.

cannot think of better proxies.

Moreover, determining the actual culpability of the common drug courier is difficult. No two couriers are exactly the same, but they fall into categories. There are the couriers who do not know what they are carrying, but suspect it is a drug of some kind and do not have knowledge about the quantity; they just know that, if they drive the car or carry the bag to someone, they get $1,500.00. A second category of courier is the person who knows he or she is carrying drugs, knows something about the drugs, such as what the drugs and weight are, and thus some idea about the quantity. A third category is the courier who rented the car, knew the people involved, and knows a little more about the drug organization. A fourth category of courier is the courier who does other things, such as making a few deals or sending money to Mexico. There are other categories. The question is how to assign different base offense levels to each of these categories. And thus, the Commission would have to create categories for the retail salesperson, the money counter, the money launderer, the telephone person, the enforcer, and other categories. And then the Commission would have to compare categories: how do you compare a courier with the person who is moving money to Mexico? The complexity of the task is a bit overwhelming. And there is no uniformity. After looking at the alternatives, it appears that type and quantity are the best proxies available.

The Court agrees with Judge Gleeson that, if the Commission had based its post-ADAA ranges on empirical data or on Commission expertise in the narrow, statistical sense, the ranges would be much less severe. The result would likely have been the same as pre-ADAA sentencing practice. Hence, Judge Gleeson's observation, while true, does not state much. The problem with pre-ADAA sentencing and the hypothetical ranges based on empirical data or on Commission expertise is that Congress thought that the pre-ADAA sentencing practice did not

sufficiently punish drug offenders.

It is less clear, however, that if the Commission had based its post-ADAA ranges on actual culpability of defendants, the sentencing ranges would be much less severe. At some point, the Commission has to set a base offense level. If the base is the offense level for a courier, and the Commission sets the floor base level, then sentences might end up being the same. A system based on actual culpability of defendants does not guarantee less serious sentences; the sentences all depend on where the base is.

Judge Gleeson states that, if the Guideline ranges for drug trafficking offenses were based on empirical data, Commission expertise, and actual culpability of defendants, they would be less severe, and judges would respect them more. If by "respect" Judge Gleeson means impose a sentence within the Guideline range, he may be right that many federal judges would prefer lower sentences. On the other hand, many judges, including this one, respect the Guideline ranges, and while they may vary, they would not respect the Guideline ranges more if the Commission ignored Congress or used a different method. Variances under 18 U.S.C. § 3553(a) do not mean judges do not respect the Guideline ranges; rather, judges should respect the Guideline ranges here because the Commission had some rationale for what it did.

Judge Gleeson thinks that the genesis of the alleged structural flaw is rooted in the Commission's choice to tie the Guideline ranges for all drug trafficking offenses to the mandatory minimum penalty in the ADAA. Echoing his earlier criticism of the ADAA, Judge Gleeson contended that the Commission erred in its methodology, because the Guideline ranges that it produced are insufficiently sensitive to individual culpability. While the Court agrees that the ADAA was the triggering event, that terse observation does not tell the whole story behind the ADAA -- that is, the death of Len Bias and the resulting political outcry. In the end, this

alleged structural flaw collapses into Judge Gleeson's more general criticism of the ADAA.  As the Court has already explained, that line of reasoning suffers from the same flaws that are fatal to his criticism of Congress: individual culpability is but one variable in the sentencing policy calculus, and it is for the Commission to solve the equation, within limits that Congress sets.

Instead of trying to tailor for actual culpability of defendants in the base offense level, it may be better to fashion an individual sentence with enhancements, deductions, departures, and, of course, variances.  Base offense levels, whether based on empirical data or on the Commission's decisions that incorporate what Congress wants, are blunt objects; it is better to tackle the problem with enhancements, deductions, departures, and variances than trying to adjust the base offense level.  Trying to determine actual culpability of defendants with the base level is a difficult issue and may be a futile effort.

Judge Gleeson is, of course, correct that Congress can fix, and in fact has fixed, problems with the Commission's Guideline ranges in other areas.  Judge Gleeson described the Feeney Amendment to the PROTECT Act as a "humiliating rebuke of the Commission" in which "Congress simply bypassed the Commission altogether, making sweeping amendments to the Guidelines by legislation."  2013 WL 322243, at *9 & nn.75-77.  Beneath its incredulous tone, this passage does nothing more than describe the proper functioning of the nation's constitutional order: when the Commission acts in a way that is inconsistent with the will of Congress, Congress acts.  Perhaps Congress should do so in drug trafficking cases as well.  It has not, however, and until it does, the Court will give the Commission's Guideline ranges their due respect.

The Court also notes that, with respect to Judge Gleeson's criticism of the United States' charging decisions, he seems to have gotten a good deal of what he wanted with the Holder

Memorandum.  The Court is more reluctant than Judge Gleeson to tell the executive branch how to charge defendants; separation-of-powers and comity principles generally counsel against such an act.  Setting that issue aside, however, the Holder Memorandum shows that the executive is aware of the issues that Judge Gleeson identifies and can act, in its discretion, to resolve them.

Moreover, Booker v. United States and its progeny give federal courts the tools to address severity in the Guidelines.  After the Supreme Court of the United States rendered the Guidelines advisory, thereby allowing courts to vary from them, the federal courts now have tools to temper any severity in the Guideline range in particular cases.  The Guidelines may set the center of gravity for sentences too high for Judge Gleeson's taste -- and Kimbrough v. United States empowers him to act on those beliefs -- but the Court believes that the Guideline range reflects the people's decision that quantity is the best available way to determine how much to punish a drug offender, and the Court will continue to give the resulting Guideline range its due.  Where appropriate, the Court will vary -- as it has for Reyes -- but it will do so for reasons more closely tied to the factors in § 3553(a) and not because of a Kimbrough v. United States disagreement with the Guideline.

With this framework in mind, the Court briefly comments on the Commission's proposed amendments to the drug trafficking Guideline ranges, see U.S. Sentencing Comm'n, Proposed Amendments to the Sentencing Guidelines, available at http://www.ussc.gov/Legal/ Amendments/Reader-Friendly/20140114_RFP_Amendments.pdf.  ("Proposed Amendments"), which the Commission will consider in the days after the Court issues this Memorandum Opinion and Order.  It is worth noting what the Commission has proposed to do in its proposed amendments to § 2D1.1 of the Guideline -- and what it has not done.  The Commission is considering lowering the "Drug Quantity Table so that the quantities that trigger the statutory

mandatory minimum penalties trigger base offense levels 24 and 30, rather than 26 and 32."
Proposed Amendments at 35.  Doing so will "establish[] guideline ranges with a lower limit
below, and an upper limit above, the statutory minimum."  Proposed Amendments at 35.  The
Commission's original ranges set the Guideline ranges slightly higher than the mandatory
minimums to allow judges to adjust downward for a cooperating defendant.  See Proposed
Amendments at 33.  The Commission's comments on its proposed amendments underscore the
proposal's purpose: to incorporate Congress' mandatory minimums correctly, but also to
reconcile those mandatory minimums with numerous intervening changes in drug policy -- most
significantly, the multiplication of sentencing enhancements and downward adjustments, and the
effects of the safety valve on plea bargaining.  See Proposed Amendments at 33-34.  Perhaps
most importantly, it did not take the unscientific approach that Judge Gleeson suggests:
immediately slashing the Guideline ranges by a third.  In this sense, the Commission appears to
firmly grasp its role in constructing a sentencing regime that respects congressional intent.[24]

       As the Commission itself acknowledges, the Guidelines manifest a compromise among
competing philosophies of criminal justice.  In that sense, the issue in this case is just one part of
an intricate puzzle: how should society decide what punishment is appropriate for what offenses?
With respect, this puzzle has no "simple" answers, contra United States v. Diaz, 2013 WL

_____

       [24] The Court does not have the mathematical expertise to agree or disagree with Judge
Gleeson's concern about participants in this debate injecting into a difficult-enough debate "the
incendiary suggestion that [variances from the Guideline ranges] must be stopped in the name of
racial equality" -- a suggestion that, as Judge Gleeson notes, is based on a much criticized study.
2013 WL 322243, at *17.  This debate is important, and the participants certainly should not use
overheated rhetoric based on flawed studies.  The Court is not convinced, however, that "the
Commission should take affirmative steps to remove the race issue, which it unwisely inserted
into the discussion of federal sentencing policy, from the debate." 2013 WL 322243, at *18.
Federal courts, of all people, must be vigilant to detect sentencing disparities based on race, and
the Court cannot fault the Commission for being sensitive to the issue.  Of course, the
Commission should rely only on good studies, but the debate seems healthy.

322243, at *11.    In the federal system, the people decide the answer, Congress enacts their decision, and the Commission responds to it the best it can.  The Court declines the invitation to assign "very little weight" to the considered judgment of those entities and the people they represent.

As sentencing judges know, the diverse purposes of sentencing exist in tension.  When a sentencing judge seeks to do justice on the retail level, the judge has the duty to reconcile those purposes as they relate to an individual case.  When, however, Congress designs a system of sentencing on the wholesale level, it has the prerogative, within constitutional constraints, to design a system that does the will of the people as Congress understands it.  And when the Commission implements that system, it does not abuse its office by responding to Congressional enactments.

It is understandable, perhaps inevitable, that individual judges will become convinced that Congress and the Commission have gotten the balance wrong in some category of cases. The Supreme Court has recognized judges' authority to act on those convictions.  See Spears v. United States, 555 U.S. at 265-66 ("[D]istrict courts are entitled to reject and vary from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."); Rita v. United States, 551 U.S. 338, 351 (2007)(permitting sentencing judges to hear arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations").  Individual judges do not speak for the federal bench, however, and the Court does not share the concerns that Judge Gleeson has raised about the Guideline ranges at issue.  Some judges might think it wise to use a memorandum opinion to criticize Congress, the Commission, and, ultimately, the people.  The Court is not so bold.  "Maybe Congress ought to make the statute books more rational. . . .  [B]ut the task of determining how close to make the fit between offense and

sentence is legislative."  United States v. Marshall, 908 F.2d 1312, 1321 (7th Cir. 1990)(en

banc)(Easterbrook, J.), aff'd as Chapman v. United States, 500 U.S. 453 (1991).

## IV.    THE COURT WILL NOT CONSIDER THE COST OF INCARCERATION AS A SENTENCING FACTOR.

The Court also disagrees with Judge Gleeson's and others' convictions that courts should,

in deciding a sentence, fret about prison over-crowding and the related prison-spending problem.

The Court does not dispute the facts he cites or the over-crowding that he identifies.  Congress is,

however, fully equipped to solve any over-crowding problem.  Indeed, Congress is much better

equipped than the federal courts to balance the expense of the nation's prison system with the

necessity of incarcerating particular offenders.  Prison over-crowding -- or under-building -- may

be a real problem, but Judge Gleeson's approach would have the drug-trafficking-sentencing tail

wag the prison-spending dog.  Congress can solve this problem better than judges can, and the

federal courts do not improve matters by introducing sentencing chaos into the mix of issues that

Congress must resolve in deciding how much of the nation's treasure to devote to the prison

system.

It intrigues the Court when judges cite saving taxpayer dollars as a reason to give lower

sentences.  As far as the Court can see, saving taxpayer dollars is not one of the § 3553(a)

factors.  It is possible that creative judges and lawyers can squeeze saving taxpayer dollars into

"the kinds of sentences available" or some other sentencing factor, but the more reasonable

explanation is that, if Congress wanted judges to be concerned about saving taxpayer dollars, it

would have explicitly mentioned that factor.  More likely, Congress probably thought that

sentencing and balancing the explicit § 3553(a) factors is hard enough without the judge having

to worry about what imprisonment or supervision will cost.  Moreover, it is likely that Congress

does not want judges to worry about the costs of incarceration and supervision; if a defendant

needs to be incarcerated or supervised, Congress probably wants judges to incarcerate or supervise, and not reduce the sentence because of costs.  Hence, while judges are qualified to criticize mandatory minimum sentences as costing too much, the argument is not legitimate. Congress and the people do not want judges to worry about costs when trying to determine what the appropriate sentence is for an individual defendant.  Congress -- and many states -- may rather build more prisons than eliminate mandatory minimums.  In the end, the question how to allocate the nation's resources is a legislative task and not a judicial task.

Also, in light of the enormity of our nation's budget, it is somewhat humorous to watch judges tilt their sentencing-cost lances in individual cases at the prison-cost windmill.  In the proposed budget that the Obama Administration submitted for the fiscal year 2013, it allocated to the Bureau of Prisons less than $7 billion out of a proposed budget of approximately $3.8 trillion. See Fiscal Year 2013 Budget of the U.S. Government available at 140, 214 http://www.whitehouse.gov/sites/default/files/omb/budget/fy2013/assets/budget.pdf.   In other words, even if the Administration got everything it asked for, the entire Bureau of Prisons would consume less than .002% of the federal budget.  Granted, other agencies spend money that relates to sentencing, but the point remains: all of this judicial handwringing is over a small percentage of the national budget.  Moreover, the nation is borrowing about forty cents of every dollar it spends.  While the public probably would appreciate any federal entity that would give any thought to saving taxpayer dollars, the concern is relatively insignificant in the scheme of things, and it is a concern that Congress does not appear to want the courts to spend a lot of time or effort addressing when it is trying to come up with an appropriate sentence for an individual defendant.  In sum, this argument is makeweight and weak.  While the ADAA's mandatory minimums and the related increases in the Guideline range for drug trafficking have, no doubt,

increased the federal prison population some, that marginal increase is not among the factors that the Court should properly consider in sentencing an individual defendant.

What is more, Congress has directed the Commission to consider the nation's resources in constructing its Guideline ranges:

> **(g)** The Commission, in promulgating guidelines pursuant to subsection (a)(1) to meet the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code, shall take into account the nature and capacity of the penal, correctional, and other facilities and services available, and shall make recommendations concerning any change or expansion in the nature or capacity of such facilities and services that might become necessary as a result of the guidelines promulgated pursuant to the provisions of this chapter.  The sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission.

28 U.S.C. § 994(g)(emphasis added).  Interpreting this statute, the Commission has stated that it "intends to consider the issue of reducing the costs of incarceration and overcapacity of prisons, to the extent it is relevant to any identified priority."  Sentencing Guidelines for United States Courts, 78 Fed. Reg. 51820, 51821 (Aug. 21, 2013).  This statute demonstrates that, when Congress wants an entity to consider the effects of a sentence on the nation's resources, it knows how to do so.  Because Congress has directed the Commission to consider "the likelihood that the Federal prison population will exceed the capacity of the Federal prisons" in designing wholesale sentencing policy -- and has not directed courts to consider that concern in crafting an appropriate sentence in an individual case under 18 U.S.C. § 3553(a) or otherwise -- the Court will not consider it or the more general concern of prison costs, in Reyes' case or in other cases.

Accordingly, Reyes is committed to the custody of the Bureau of Prisons for 30 months for the reasons stated at the sentencing hearing.  While a variance equal to about two levels is appropriate, the Court will not base that variance on a Kimbrough v. United States disagreement with the Guideline range as Judge Gleeson has done or on the cost of incarceration.  Rather,

Booker v. United States and § 3553(a) give the Court ample tools to craft a sentence that better reflects the factors in § 3553(a) than the baseline of the Guideline range of 51 to 63 months.

**IT IS ORDERED** that the requests in Defendant Kayla Marie Reyes' Sentencing Memorandum and Motion for a Downward Variance, filed March 21, 2013 (Doc. 45), are granted in part and denied in part.  The Court will vary from the Guideline range, but not as much as Reyes requests or for the reasons she requests.  Reyes is committed to the custody of the Bureau of Prisons for 30 months.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Charles Barth
  Assistant United States Attorney
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Richard Winterbottom
  Assistant Federal Public Defender
Albuquerque, New Mexico

        *Attorney for the Defendant*